**FLM COLLISION PARTS, INC.,
Plaintiff,**

**v.**

**FORD MOTOR COMPANY and Ford
Marketing Corporation,
Defendants.**

**No. 73 Civ. 713.**

United States District Court,
S. D. New York.

Dec. 19, 1975.

---

Alfred S. Julien, Stuart A. Schlesinger, David L. Wasser, David Jaroslawicz, Julien & Schlesinger, P. C., New York City, for plaintiff.

Robert MacCrate, Sullivan & Cromwell, William M. Dallas, Jr., New York City, William A. Zolbert, Dearborn, Mich., for defendants.

## OPINION

GRIESA, District Judge.

This is an antitrust action under Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Antidiscrimination Act, 15 U.S.C. § 13(a) (hereafter referred to as Section 2(a) of the Robinson-Patman Act), and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

Plaintiff FLM Collision Parts, Inc., is a small company located in Yonkers, New York, and is in the business of dealing in "crash parts" for cars made by defendant Ford Motor Company—*i. e.*, Ford, Mercury and Lincoln cars. Crash parts consist of fenders, grills, panels, and other parts used to repair a car

which has been in an accident or needs replacement of such parts for some other reason.

These crash parts are manufactured only by Ford Motor Company or by other manufacturers who make the parts to Ford's specifications. With certain exceptions not here relevant, these crash parts are sold by Ford[1] only to franchised Ford and Lincoln-Mercury dealers. The franchised dealers[2] either use the crash parts in their own repair work for customers, or resell them to independent repair shops.

The problem in this case arises from the circumstances under which Ford grants a so-called "wholesale incentive" allowance in the sale of crash parts to Ford dealers. Ford grants, or does not grant, the wholesale incentive allowance to the dealers depending on the use they make of the particular parts. If a dealer uses a part in repair work for a customer, this involves a retail sale of the part, and the dealer does not obtain a wholesale incentive allowance on that part. But if a dealer sells the part to an independent repair shop, this involves a wholesale transaction, and the dealer may obtain the wholesale incentive allowance on that part.

FLM set itself up to supply Ford crash parts to independent repair shops. At first it sought to buy directly from Ford, but when this request was refused, FLM commenced purchasing crash parts from a Ford dealer in Brooklyn to whom FLM was referred by Ford. FLM then proceeded to sell crash parts, purchased from the Brooklyn dealer, to independent repair shops, mainly in Bronx and Westchester counties.

The wholesale incentive allowance was established by Ford in 1968. Thereafter, until 1972, Ford permitted the Brooklyn Ford dealer to receive the wholesale allowance on parts sold to FLM, which allowance was almost entirely passed on to FLM, thus substantially reducing FLM's costs. Commencing in 1972, Ford refused to grant the wholesale incentive allowance on parts sold to FLM, and restricted the allowance to those parts which were sold by franchised Ford dealers *directly* to independent body shops.

FLM contends in this action that Ford's current pricing policies violate Section 2(a) of the Robinson-Patman Act in two regards: *First*, that Ford, by charging one price to a franchised dealer when it sells to an independent repair shop, and a higher price to a franchised dealer when it sells to FLM, is engaging in unlawful price discrimination in its sales to the franchised dealers, resulting in injury to FLM for which FLM has standing to recover; *second*, that FLM is itself a "purchaser" from Ford—*i. e.*, an "indirect" purchaser—and as such has standing to sue Ford under the Robinson-Patman Act. FLM further contends that Ford has violated Section 1 of the Sherman Act in combining and conspiring with its franchised dealers to injure FLM competitively. Finally, FLM contends that Ford has violated Section 2 of the Sherman Act in that Ford has monopolized or attempted to monopolize the wholesale market for Ford crash parts. FLM seeks injunctive relief and treble damages.

The case has been tried to the Court without a jury. This opinion constitutes the Court's findings of fact and conclusions of law on the liability phase of

1. Ford Marketing Corporation was incorporated in 1970, and commencing in July 1970 was responsible for the marketing of Ford, Mercury and Lincoln automobiles and related products. Prior to July 1970 this marketing function had been performed by the manufacturer, Ford Motor Company. It appears that subsequent to the trial of this action Ford Marketing Corporation was dissolved, and the marketing function was returned to

Ford Motor Company. For the purposes of this case, defendants Ford Motor Company and Ford Marketing Corporation will usually be treated as a single entity, and will be referred to as "Ford".

2. For purposes of simplicity, in this opinion I will refer to franchised Ford, Mercury and Lincoln dealers as "Ford dealers".

the case. The record on damages has not been completed. A supplemental opinion will be issued on the award of damages, including attorneys' fees.

### Summary of Conclusions

The following is a summary of my conclusions. I hold that FLM has proved a violation of Section 2(a) of the Robinson-Patman Act based upon the first theory described above—that Ford is engaging in unlawful price discrimination in sales of crash parts to its dealers, resulting in injury to FLM for which FLM has standing to sue. I reject the Robinson-Patman claim of FLM based on the "indirect purchaser" theory. I also reject FLM's claims under both Sections 1 and 2 of the Sherman Act.

### Facts

FLM commenced its business in 1965. The two principals of the company are Stephen McKee and John Andidero, both of whom had been employed previously by Ford dealers in parts operations. FLM's first idea was to buy crash parts directly from Ford and sell them to independent repair shops. FLM discussed this with a representative of Ford, but was advised that Ford would only sell its crash parts to franchised dealers. In early 1965 an employee of Ford in New York City by the name of Joe Collura introduced McKee and Andidero to Central Lincoln Mercury Corp., located in Brooklyn, New York. This led to an arrangement for FLM to buy crash parts from Central at 2% over Central's cost.

At this time there was no wholesale incentive allowance available on crash parts to franchised Ford dealers. The dealers paid the same price—"dealer price"—for crash parts whether they used them in their own repair shops (*i. e.*, made retail sales) or sold them to independent repair shops (made wholesale sales). The "dealer price" was the "suggested list" or retail price, less 42%.[3]

It is useful to examine the effects of the crash parts price structure as it existed at the time FLM commenced business in 1965 until the advent of the wholesale incentive allowance, which was instituted in 1968. Let us assume the sale by Ford of a crash part to a dealer, carrying a suggested list price of $10. The dealer would pay the dealer price of $5.80—*i. e.*, the suggested list price less 42% or $4.20. The Ford dealer could use the part in his own repair operation, and would presumably charge the customer the suggested list price of $10, thus making a gross profit of $4.20. The Ford dealer could also sell the part to an independent repair shop. In such a sale the Ford dealer would presumably make some markup over the dealer cost of $5.80. The inevitable result would be that the Ford dealer and the independent repair shop, both potentially competing for the repair business of Ford owners, would be incurring different costs for the same type of crash part—the dealer paying $5.80, the repair shop $5.80 plus.

To return to the situation of FLM, FLM was buying parts from Central Lincoln Mercury for 2% over dealer price. Using the same $10.00 part as an example, FLM would purchase this part for the dealer cost of $5.80 plus the 2% markup, or a total of $5.92. FLM would be competing with franchised Ford dealers for the business of the independent repair shops. Although there is no explicit testimony about the price which FLM was charging to repair shops in its early years, a reasonable inference from

3. It appears that prior to 1968 the amount of the allowance used in calculating the dealer price was 42%, and that commencing in 1968 the amount of this allowance was 40%. There were certain other discounts or allowances granted, under certain circumstances, to dealers in connection with the purchase of crash parts. FLM makes claims for damages based on certain allegations of inability to obtain these allowances. These claims will be discussed in the supplemental opinion regarding damages.

the evidence is that this was suggested retail price less 25%. Applying this percentage to the hypothetical $10.00 part would give the figure of $7.50 as FLM's price to the repair shops, for a part costing it $5.92.

With respect to FLM's competition with Ford dealers for the business of independent repair shops, there is no explicit evidence regarding what prices the dealers were charging to the independent repair shops during this period. However, the reasonable inference is that FLM's prices were at about the same level as the prices charged by the Ford dealers. In any event, FLM was able to compete effectively.

The business of FLM grew steadily. FLM offered certain services to the independent repair shops which the franchised Ford dealers generally did not provide. FLM would visit repair shops, inspect damaged vehicles and advise respecting exactly what parts would be needed to make the proper repairs. FLM carried sufficient inventory so that it could often fill an order the same day it was placed. If FLM did not have a part in its own inventory, it would attempt to procure the part and deliver it no later than the following day. FLM delivered parts to the repair shops, something apparently not done by most of the franchised dealers.

The following figures show the results of FLM's operations commencing with the fiscal year ending September 30, 1966 (the first full year of FLM's operations) through the fiscal year ending September 30, 1968. The latter was the last full year prior to the advent of the wholesale incentive allowance.

### Fiscal 1966

| | | |
|---|---|---|
| Sales | $245,738.00 | |
| Cost of Parts | $201,376.00 | |
| Gross Profit | $44,362.00 | (18.1%) |
| Other Expenses (including officers' salaries of $16,680) | $44,256.00 | |
| Net Operating Profit After Taxes | $80.70 | |

### Fiscal 1967

| | | |
|---|---|---|
| Sales | $337,257.00 | |
| Cost of Parts | $276,121.00 | |
| Gross Profit | $61,136.00 | (18.1%) |
| Other Expenses (including officers' salaries of $23,520) | $60,927.00 | |
| Net Operating Profit After Taxes | $109.00 | |

### Fiscal 1968

| | | |
|---|---|---|
| Sales | $389,987.00 | |
| Cost of Parts | $323,959.00 | |
| Gross Profit | $66,028.00 | (16.9%) |
| Other Expenses (including officers' salaries of $26,520) | $65,858.00 | |
| Net Operating Loss After Taxes | -$769.00 | |

Ford maintained a parts depot at Teterboro, New Jersey. Central Lincoln Mercury provided FLM with an authorization so that FLM could pick up parts at Teterboro. Bills were rendered by Ford to Central, who would then segregate the bills relating to the FLM purchases from the bills relating to other purchases made by Central. In its dealings with Ford, Central was identified by a "dealer code number"— 11283.

In order to simplify the accounting for the FLM purchases, Central requested that a separate code number be given by Ford to Central for the parts which it purchased for resale to FLM. Ford agreed to this, and commencing in late 1968, Ford assigned a second code number to Central—13430. This code number was in the name of Central, but the billing address was the address of FLM in Yonkers.

The wholesale incentive allowance for crash parts was instituted in November 1968. At some time prior thereto, the Federal Trade Commission advised Ford that the distribution of crash parts to independent repair shops at higher prices than those charged to franchise dealers for use in the dealers' repair shops violated Section 5 of the Federal Trade Commission Act. No formal proceedings were instituted. The matter

was settled when Ford agreed to allow a discount from dealer's prices for certain classes of crash parts when the franchised dealers resold such parts for use by independent repair shops. The amount of this wholesale incentive allowance on crash parts was initially set at 20%. It applied to some, but not all, crash parts. The record shows that in 1971 there were a total of 10,000 kinds of crash parts sold by Ford, of which about 4,800 were eligible for a wholesale incentive allowance.

The agreement between Ford and the Federal Trade Commission did not expressly provide whether or not a wholesale incentive allowance should be allowed in the event of sales by a Ford dealer to a party such as FLM, acting as middleman between the Ford dealer and the independent repair shop. However, it has been stipulated that from the inception of the wholesale incentive allowance for crash parts until a Ford policy change in mid-1971, a franchised Ford dealer reselling crash parts to FLM was entitled to claim the wholesale incentive allowance on such resales.

In 1968 Ford changed the amount of the discount used to reach the basic dealer price from 42% to 40%. Thus, after 1968, the basic dealer price on a part whose suggested retail price was $10.00 was $6.00 instead of $5.80. In January 1970 Ford increased the wholesale incentive allowance from 20% to 25% for those crash parts to which the allowance applied.

The wholesale incentive allowance was obviously a great benefit to FLM. This is illustrated by returning to our example of the $10.00 crash part. The price paid by FLM's supplier, Central, was $6.00. However, when Central sold this part to FLM, Central received a wholesale incentive allowance equal to 25% (using the post-January 1970 percentage) of the $6.00—or $1.50. Thus Central paid only $4.50 for the part. Following the institution of the wholesale incentive allowance, Central charged FLM a markup of 3% of the basic

dealer price—here $6.00. In the example this markup would be 18¢. Thus FLM paid Central $4.68. As already noted, it appears that the wholesale incentive allowance was granted by Ford on only about half the crash parts sold by Ford. Obviously, in the example of the $10.00 part, if the wholesale incentive allowance were not in effect, FLM would pay $6.18.

With regard to FLM's resale prices to the repair shops, and the resale prices of FLM's competitors, the Ford dealers selling directly to the repair shops, there is no explicit evidence in the record as to what such prices were during the time FLM was receiving the benefit of the wholesale incentive allowance. The Federal Trade Commission had contemplated that, following the institution of the wholesale incentive allowance, the Ford dealers would reduce their prices on the covered parts to the same level paid by the Ford dealers when these dealers sold at retail. In the example of the $10.00 part this would be $6.00. The Commission contemplated that, if the Ford dealer obtained a further wholesale incentive discount when the part was sold to independent repair shops, the dealer could afford to resell the part to the repair shops at the $6.00 price.

Apparently there was substantial unwillingness on the part of Ford dealers to reduce the prices charged to the repair shops to the levels contemplated by the Federal Trade Commission. Since the present case does not involve a complaint by an independent repair shop regarding prices charged by a Ford dealer, this issue was not pursued in any depth at the trial.

The only relevance of this matter to the present case is to explain that after the institution of the wholesale incentive allowance for crash parts in 1968, the prices charged by the Ford dealers, at least in FLM's area of competition, do not appear to have been reduced substantially. It appears likewise that FLM did not reduce its prices

substantially, and that the principal effect of the wholesale incentive allowance on FLM was to increase its profitability.

The following figures show the profit pictures of FLM after the wholesale incentive discount became effective. Again, the fiscal years refer to years ending September 30.

### Fiscal 1969

| | | |
|---|---|---|
| Sales | $483,015.00 | |
| Cost of Parts | $345,112.00 | |
| Gross Profit | $137,903.00 | (28.6%) |
| Other Expenses (including officers' salaries and commissions of $39,360) | $96,752.00 | |
| Net Profit After Taxes | $25,418.00 | |

### Fiscal 1970

| | | |
|---|---|---|
| Sales | $620,769.00 | |
| Cost of Parts | $444,865.00 | |
| Gross Profit | $175,904.00 | (28.3%) |
| Other Expenses (including officers' salaries and commissions of $62,700) | $141,106.00 | |
| Net Profit After Taxes | $22,847.00 | |

### Fiscal 1971

| | | |
|---|---|---|
| Sales | $654,382.00 | |
| Cost of Parts | $448,264.00 | |
| Gross Profit | $206,118.00 | (31.5%) |
| Other Expenses (including officers' salaries of $83,200) | $179,938.00 | |
| Net Profit After Taxes | $18,699.00 | |

### Fiscal 1972

| | | |
|---|---|---|
| Sales | $736,967.00 | |
| Cost of Parts | $490,347.00 [4] | |
| Gross Profit | $246,620.00 | (33.5%) |
| Other Expenses (including officers' salaries of $83,200) | $194,232.00 | |
| Net Profit After Taxes | $21,091.00 | |

It should be noted at this point that Ford markets a wide variety of spare parts other than crash parts. These other parts include spark plugs, filters, carburetors, etc., and are marketed under the Ford brand name and under the brand names "Autolite" and "Motorcraft". Wholesale incentive allowances on the spare parts other than crash parts had been instituted prior to 1968.

The Ford witnesses have testified that commencing in 1969 Ford found that wholesale incentive allowances were running higher than had been estimated In 1969 the total wholesale incentive allowances granted by Ford for all types of parts amounted to $45.8 million, of which $12.7 million related to crash parts.

Ford was concerned about possible large-scale violations by dealers of Ford's rules regarding the wholesale incentive allowance. Ford's rules prohibited, among other things, payment of the allowance on parts sold by one Ford dealer to another Ford dealer either directly or through an intermediary. Ford was concerned about the possibility of one Ford dealer obtaining the allowance for purported use in wholesale sales, and then transferring the parts to another Ford dealer, who would sell them at retail. In this instance, the first Ford dealer would simply be a conduit, and the second Ford dealer would be getting the benefit of the allowance although not making the wholesale sales which the allowance was intended to cover.

Another "abuse" of the wholesale incentive allowance, in Ford's view, was the claiming of the allowance by Ford dealers for parts sold to insurance companies in connection with the repair of cars. Ford regarded these as retail sales, ineligible for the allowance. Still another abuse was claiming the wholesale incentive allowance on parts which had not been purchased from Ford.

In 1969 Ford selected 37 out of its 6700 dealers for audits to determine the validity of the wholesale incentive allowances the selected dealers had claimed. These 37 dealers were ones with unus-

4. This is a restated figure, deducting from the cost of parts the amount of $621,897.00 wholesale incentive allowance settled in fiscal 1973 and applicable to 1972.

ually high claims for wholesale incentive allowances.

Central Lincoln Mercury, FLM's supplier, was one of the dealers audited. This audit covered not only the records of Central, but also the records of FLM. FLM consented to such an examination. It is conceded by the Ford witnesses that the amount of incorrect wholesale allowance claims involving FLM was "minimal" and that this was a "clean audit." The audit covered the period from November 1968 through September 1969. The finding of the audit report dated November 21, 1969 was that there were total "discrepancies" of $2,185.23, of which $1,458.34 related to sales to Ford dealers. The balance of the discrepancies related to "return sales not deducted." There were no discrepancies arising from sales to insurance companies or purchases from outside sources. For some reason, the audit report does not disclose the total amount of wholesale incentive allowances claimed with regard to FLM for the November 1968—September 1969 period, although the audit report states that for the period January through May 1969 the total claims were $24,446. In any event, the amount of the discrepancies was considered minimal as compared with the total claims.

Following the completion of the 37 audits, Ford made a statistical evaluation in order to estimate the overall proportion of improper wholesale allowance claims for all dealers. The estimate was that for the period of the audit there were between $1.2 million and $2.1 million in improper claims out of a total of $44.5 million claims.

In the fall of 1970 there was a second audit of Central and FLM, resulting in an audit report dated November 6, 1970. The audit report stated that the wholesale incentive claims "were tested and found to be generally accurate, properly supported, and submitted in accordance with the provisions of the wholesale parts incentive program." No discrepancies were noted.

During 1970 Ford undertook a reconsideration of the second parts code number which had been issued to Central for use in connection with its sales to FLM. The second code number was discontinued as of the end of January 1971. Central continued to sell to FLM and to obtain the wholesale incentive allowance on sales to FLM until a subsequent time, as will now be described.

In July 1971 Ford amended its rules regarding the wholesale incentive allowance, with the effect that a Ford dealer could not obtain the allowance on parts sold to a party such at FLM. It is this amendment that has given rise to the present action.

Ford asserts that this change regarding the wholesale incentive allowance was the result of three considerations. The first of these was the concern that a party such as FLM might act as an intermediary in transfers of parts between Ford dealers. The second consideration was that a Ford dealer selling to a party such as FLM was not really performing the "wholesale function," but was delegating this function to a middleman such at FLM. The third consideration was that, if Ford dealers were allowed to obtain a wholesale incentive allowance in selling to a party such at FLM, who was acting as a wholesaler, the Ford dealer would not be content with the wholesale allowance, but would demand an even greater allowance—a distributor's allowance.

The only witness at the trial who participated in the discussions of these matters within Ford was Morris J. Rowlands. He testified that he could recall no specific discussion of FLM in connection with the amendment of the wholesale incentive allowance rules in July 1971. He testified that the discussions were in general terms, in order to arrive at a consistent overall policy applicable to all types of spare parts, including but not limited to crash parts.

Certain facts should be noted with respect to the three considerations de-

scribed above. As to the first, there was not the slightest indication that FLM was either actually or potentially the kind of intermediary between Ford dealers which Ford was concerned about. It is undisputed that FLM, aside from an occasional sale to a Ford dealer in an emergency, sold its crash parts entirely to independent repair shops. The "discrepancies" found in the 1969 audit were minimal, and in the 1970 audit were nonexistent.

As to the second consideration—Ford's alleged desire to grant the wholesale incentive allowance only where Ford dealers are performing what Ford considers to be the "wholesale function"—this raises a question of law, to be discussed hereafter, as to whether Ford is legally entitled to use the wholesale incentive allowance in such a way as to insure that a Ford dealer sells directly to a retailer rather than selling indirectly through a party such as FLM.

As to the third consideration—Ford's fear that Ford dealers selling to wholesalers would claim a distributor's allowance—Ford admits that, whatever this problem may have been, it related in no way to crash parts or to FLM. Ford's evidence is that it was concerned in this regard about Autolite and Motorcraft, where one channel of distribution involved distributors. Ford allegedly believed that if Ford dealers were encouraged to compete with the distributors in marketing Autolite and Motorcraft parts to wholesalers, then the Ford dealers would claim a distributor's allowance. Thus Ford was not willing to grant any incentive at all to Ford dealers in order to encourage them to sell these parts to wholesalers.

Ford contends that, although this problem did not relate directly to FLM or to crash parts, Ford desired to have a uniform policy for the wholesale incentive allowance applicable to all types of parts, rather than to have one policy for crash parts and a different policy for Autolite and Motorcraft parts.

I must note here that, even as to the Autolite and Motorcraft parts, there is no showing that any Ford dealers were in fact demanding distributors' allowances for sales of spare parts to wholesalers.

In any event, as already described, Ford's rules were changed in July 1971 to provide that a Ford dealer could obtain the wholesale incentive allowance on parts which were sold directly to independent repair shops, but could not obtain the allowance for parts sold to parties such as FLM, who would resell them to the independent shops.

Although Ford denies that this change of policy was specifically directed to FLM, it should be noted that there was no other company besides FLM who had successfully established a business of acting as middleman between Ford dealers and independent repair shops in the sale of crash parts.

Apparently because of some administrative error on the part of Ford, the July 1971 change of policy was not immediately enforced with regard to sales by Central to FLM. Central continued to sell crash parts to FLM and to receive wholesale incentive allowances on such sales.

In July 1972 the business of Central Lincoln Mercury was taken over by Atlas Lincoln-Mercury. It was agreed between Atlas and FLM that Atlas would make sales to FLM in the same way that Central had done.

At some point in the summer or fall of 1972 Ford awoke to the fact that Atlas was still claiming and receiving wholesale incentive allowances on sales of parts to FLM, contrary to Ford's current policy. Ford approached Atlas and proposed to charge back some $24,-000.00 in wholesale incentive allowances which had been paid to Atlas. Atlas argued that FLM was a valuable wholesale account and urged that the wholesale incentive allowance should be continued with respect to sales to FLM. Atlas particularly resisted any chargeback of allowances already paid. These discussions between Ford and Atlas occurred in late October 1972.

During this controversy, Atlas held up certain payments of wholesale incentive allowances to FLM. As a result, FLM held up certain payments which were due to Atlas. Apparently at some point the Ford depot at Teterboro, New Jersey refused to deliver parts to FLM for the account of Atlas.

FLM's attorney approached Ford requesting the continuation of the wholesale incentive allowance on sales to FLM and also complaining about the refusal of the Teterboro depot to deliver parts to FLM. Ford advised FLM's attorney that it would not negotiate directly with a representative of FLM, but would negotiate only with its dealer.

The upshot of these events was as follows. Ford persisted in its refusal to allow the wholesale incentive allowance on parts sold by Atlas, or any other dealer, to FLM. Ford withdrew its claim of charge-back against Atlas. The business relationship between Atlas and FLM was terminated.[5] All this occurred by the end of November 1972.

Subsequently FLM has purchased crash parts from certain Ford dealers without getting the benefit of the wholesale incentive allowance. Commencing in November 1972 FLM purchased parts from Thomas Motors and Parkview Lincoln-Mercury, both of Yonkers, New York. FLM paid Thomas and Parkview 5% over dealer cost. FLM dealt with Thomas Motors until June of 1973, when a new owner of that agency terminated the account. It appears that FLM continues to purchase parts from Parkview Lincoln-Mercury to the present time.

In June 1973 FLM commenced purchasing parts from Pleasantville Ford of Pleasantville, New York. Again, FLM pays Pleasantville 5% over dealer cost. FLM continues to deal with Pleasantville to the present time.

With respect to parts which FLM has purchased from Thomas Motors, Parkview Lincoln-Mercury and Pleasantville Ford, FLM has resold these parts to independent repair shops for 25% off the suggested list or retail price.

The withdrawal of the wholesale incentive allowance had a detrimental effect on FLM's profitability. The financial results for the fiscal year ending September 30, 1973 were as follows:

| Fiscal 1973 | | |
|---|---|---|
| Sales | $798,947.00 | |
| Cost of Parts | $684,758.00 | |
| Gross Profit | $114,189.00 | (14.3%) |
| Other Expenses (including officers' salaries of $82,860.00) | $199,896.00 | |
| Net Loss | ($85,707.00) | |

As of November 1, 1973, the salaries of the two officers were reduced from $800.00 per week each to $600.00 per week each. Contributions to pension funds were suspended.

At the time of the trial the final figures of FLM for fiscal 1974 were not available. However, it was estimated that sales for fiscal 1974 were approximately $694,000.00. The fiscal 1974 sales were down approximately $100,000.00 from the fiscal 1973 level. It was estimated that, at the end of fiscal 1974, FLM would have a deficit in its earned surplus account amounting to $18,607.00, after a $20,000.00 income tax refund. This contrasts with an earned surplus of $81,913.00 as of September 30, 1972.

FLM is suffering from a shortage of working capital which has restricted its ability to purchase inventory and equipment. With regard to price competition with Ford dealers for the business of repair shops, FLM is generally charging the repair shops the suggested retail price less 25%. McKee of FLM has testified, albeit in a general way, that

---

5. FLM contends, not only that Ford withdrew the wholesale incentive allowance, but that Ford directed Atlas to completely cease doing business with FLM. I reject FLM's contention on the latter point. The Ford witnesses deny that any such direction was given, and I credit this denial.

FLM is experiencing price competition from some Ford dealers which FLM cannot afford to meet.

I find that FLM has suffered impairment of its ability to compete effectively in the wholesale market of Ford crash parts.

FLM has sought to prove that Ford's withdrawal of the wholesale incentive allowance resulted at least in part from complaints from Ford dealers competing with FLM and a desire by Ford to protect such dealers. There is no sufficient proof to support this point. However, it is clear that Ford understood in general that its discontinuance of the wholesale incentive allowance on crash parts sold to parties such as FLM would substantially impair the ability of such parties to participate in the distribution of Ford parts in competition with the regular Ford dealers. Also I cannot believe that the Ford personnel responsible for the change of policy respecting the wholesale incentive allowance did not have FLM specifically in mind as a shining example of the type of successful middleman Ford was attempting to discourage.

### Conclusions of Law

#### Robinson-Patman Act

■ Section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), provides in pertinent part:

"(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchasers involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: . . ."

It is not disputed that, since November 1972, Ford has charged to Ford dealers who sell to FLM a higher price than Ford charges for the same crash parts when a Ford dealer sells directly to an independent body shop. Putting aside for the moment the question of the purpose of Ford's price differentials, it would appear at least that the basic elements of a Section 2(a) violation are made out. Ford charges different prices to different purchasers—Ford dealers—for the same crash parts.

Ford asserts two defenses to the Robinson-Patman Act claim: *First*, that FLM has no standing to assert such a claim, since FLM is not a purchaser from Ford; *second*, that Ford's price differentials are not prohibited by Section 2(a) since they involve "functional discounts."

#### a. The Standing of FLM to Sue

For its argument against FLM's standing to sue, Ford relies upon dicta in a line of cases commencing with *Klein v. Lionel Corp.*, 237 F.2d 13 (3rd Cir. 1956). The opinion of the Third Circuit contains the statement (pp. 14–15):

"The decisions of many cases have crystalized the rule that an individual can have no cause of action under Section 2(a) of the Clayton Act unless he is an actual purchaser from the person charged with the discrimination." (footnote omitted)

This statement was cited with approval in dicta in *Baim & Blank, Inc. v. Philco Corp.*, 148 F.Supp. 541, 543 (E.D.N.Y. 1957); *Bolick-Gillman Co. v. Continental Baking Co.*, 206 F.Supp. 151, 154 (D.Nev. 1961); *United Banana Co. v. United Fruit Co.*, 245 F.Supp. 161, 168 (D.Conn. 1965).

For reasons to be described hereafter, I am not at all certain that the Third Circuit intended to lay down any rule about standing under Section 2(a) as sweeping as the literal language of the dictum might indicate. In any event, I have concluded that any such rule is contrary to the intention of Congress as expressed in the Robinson-Patman and Clayton Acts.

Although Section 2(a) defines the conduct which is illegal, it does not explicitly deal with the question of what parties do or do not have standing to sue for violations. The statutory provision expressly dealing with the question of standing is Section 4 of the Clayton Act, 15 U.S.C. § 15, which provides:

> "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

On its face, Section 4 of the Clayton Act would appear to be broad enough to provide for a civil action by any party who could make out a factual case of injury to his "business or property" by reason of any violation of the antitrust law. However, the courts have taken the view that Congress did not intend to confer such broad standing. *See Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972) ("target area" doctrine applied in Sherman Act case).

In dealing with the standing problem in the present case, the most compelling consideration is presented by the implications of Section 2(a) of the Robinson-Patman Act, indicating the intention of Congress as to the ambit of the statute's protection. I refer to the language of Section 2(a), which prohibits price discrimination between purchasers,

> ". . . where the effect of such discrimination may be . . . to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: . . ."

Although the forbidden conduct under Section 2(a) is discrimination "between different purchasers," the language quoted above expressly recognizes that the competitive effects of such injury resulting from the discrimination may reach beyond the purchasers themselves. The statute, as quoted above, applies where competition is prevented (1) with a person who grants the discriminatory price, (2) a customer of the person who grants a discriminatory price, (3) a person who knowingly receives the benefit of a discriminatory price, or (4) a customer of a person who knowingly receives the benefit of a discriminatory price.

Considering this language in concrete terms, let us assume that a manufacturer (M) sells to two wholesalers (WA and WB). WA resells to a retailer (RA), and WB resells to a retailer (RB). M discriminates in price in favor of WA. This benefit is passed on to RA. RB is injured in its competition with RA.

Applying Section 2(a) to this situation, there would appear to be a violation of the statute, because M has discriminated in price between two purchasers, WA and WB, and because this discrimination has injured competition by RB with a customer (RA) of one who has received the benefit of the discrimination (WA).

It would seem to be perfectly clear that Congress intended in Section 2(a) to confer protection upon those parties who are injured in their competition with the types of beneficiaries of the discrimination described in the statute. There is no doubt that such protected parties have standing under

Section 2(a) to sue the party guilty of the discrimination. In our example, this would mean that RB would have the right to sue M, as well perhaps as WA and RA, if the latter parties had knowingly received benefit of the discrimination. This would be true even though RB is not a purchaser from M.

In *Perkins v. Standard Oil Co. of California*, 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969), plaintiff Perkins purchased gasoline and oil from Standard. Perkins was both a wholesaler, and a retailer through his own Perkins stations. Standard also sold to Signal, who resold to Signal's subsidiary Western Hyway, who in turn sold to Western's subsidiary, Regal. Standard's prices to Signal were lower than its prices to Perkins, and the benefit of the discrimination was passed on to Regal. Regal operated service stations which were able to undersell Perkins' service stations. The Supreme Court held that Perkins had a valid claim for this competitive injury. The Court noted (p. 647, 89 S.Ct. p. 1874):

> "Here, Perkins' injuries resulted in part from impaired competition with a customer (Regal) of a customer (Western Hyway) of the favored purchaser (Signal)."

The Court went on to state (p. 648, 89 S.Ct. p. 1874):

> "Here Standard discriminated in price between Perkins and Signal, and there was evidence from which the jury could conclude that Perkins was harmed competitively when Signal's price advantage was passed on to Perkins' retail competitor Regal. These facts are sufficient to give rise to recoverable damages under the Robinson-Patman Act.
>
> "Before an injured party can recover damages under the Act, he must, of course, be able to show a causal connection between the price discrimination in violation of the Act and the injury suffered. This is true regardless of the 'level' in the chain of distribution on which the injury occurs."

*See also F. T. C. v. Sun Oil Co.*, 371 U.S. 505, 514, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963).

The *Perkins* case does not, of course, expressly deal with the question of the standing of a non-purchaser to sue under Section 2(a) for competitive injury resulting from discrimination practiced upon a party farther up the line of distribution. The plaintiff in the *Perkins* case was a purchaser from Standard. However, the decision makes it clear that Section 2(a) is to be construed as covering competitive injuries at levels of distribution beyond the level of the purchasers from the defendant. The basic test enunciated by the Court for recovery of damages by an injured party was that he must "be able to show a causal connection between the price discrimination in violation of the Act and the injury suffered" (*Id.* 395 U.S. at 648, 89 S.Ct. at 1874).

In my view, the *Perkins* decision is entirely inconsistent with the view that parties having standing to sue under Section 2(a) are limited to purchasers from the defendant.

I now return to the line of cases commencing with *Klein v. Lionel Corp.*, 237 F.2d 13 (3rd Cir. 1956), referred to earlier. The plaintiff in *Klein* was a retailer selling Lionel electric trains. Plaintiff purchased trains from wholesalers at suggested retail price less 40%. These wholesalers purchased from Lionel at suggested retail price less 52%. Lionel sold its trains directly, not only to wholesalers, but also to chain stores and mail order houses. Lionel charged the same price to the chain stores and mail order houses as it did to the wholesalers. Plaintiff sued, claiming that he was in competition with the chain stores and the mail order houses and that under Section 2(a), he should have been able to obtain his trains at the same prices as were charged to these chain stores and mail order houses. District Judge Rodney dismissed the complaint on a motion for summary judgment, on the ground that there had been no price

discrimination by Lionel in its sales to *its purchasers*. Judge Rodney expressly left open the question of whether a retailer would have standing to sue for injury he sustained in the event there was discrimination practiced against his wholesaler. *Klein v. Lionel Corp.*, 138 F.Supp. 560, 564 (D.Del.1956).

The Court of Appeals for the Third Circuit affirmed. However, the opinion of the court of appeals did not limit its discussion to the precise problem at hand, as Judge Rodney had carefully done. The Court of Appeals stated (237 F.2d at 14–15):

> "The decisions of many cases have crystallized the rule that an individual can have no cause of action under Section 2(a) of the Clayton Act unless he is an actual purchaser from the person charged with the discrimination. In *Shaw's, Inc., v. Wilson-Jones Co.*, 3 Cir., 1939, 105 F.2d 331, 333, we stated: 'The discrimination in price referred to must be practiced "between different purchasers". Therefore at least two purchases must have taken place. The term purchasers mean simply one who purchases, a buyer, a vendee.' Klein did purchase Lionel products, but not from Lionel. It follows that the necessary requisite of two purchasers from the same vendor is not met and Klein therefore can claim no protection under the Act as a direct purchaser." (footnote omitted)

I should note that the cases cited by the court of appeals in *Klein* in support of its dictum about standing do not in fact support the proposition. Moreover, in my view the dictum in *Klein* is contrary to the clear meaning of Section 2(a), and cannot be followed in view of the implications of the Supreme Court decision in *Perkins v. Standard Oil Co. of California*, 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969).

It is necessary at this point to examine the nature of the competitive injury suffered by FLM and to determine whether it is within the purview of Section 2(a).

In the hypothetical example given above, the competitive injury occurred between RA and RB, who were both retailers. Both were on the same "functional level of distribution." It is fairly easy to conceive of competitive injuries on the same functional level of distribution— i. e., wholesalers vis-a-vis wholesalers, or retailers vis-a-vis retailers—as coming within the purview of Section 2(a).

There is a distinction between such a situation and the present case which must be noted. Let us consider that in the present case M is Ford, WA is a Ford dealer selling directly to an independent repair shop, and RA is this independent repair shop. WB is a Ford dealer selling to FLM, who stands between that Ford dealer and the independent body shop (RB) who is the customer of FLM. FLM claims to be harmed because Ford has discriminated in price between WA and WB, charging a higher price to WB, who sells to FLM. But FLM is not complaining about being at a competitive disadvantage with another FLM-type middleman. Because of the relatively low markup it has been able to negotiate with WB, and because FLM has been able to offer superior services to certain independent repair shops, FLM has been able to compete with Ford dealers such as WA.

Is FLM on the same functional level of distribution as the party it is competing with—WA? In one sense it is, in that FLM competes with WA for the business of the independent repair shops. But in another sense FLM is *not* on the same functional level with WA, because FLM is twice removed in the chain of sales from Ford. Moreover, FLM is not seeking to have its purchase price equalized with the purchase price of WA. It is only seeking to have the purchase price of *WB* equalized with that of WA.

The question is whether Section 2(a) protects, among other things, the type of competition engaged in by FLM, which is with parties not precisely on the same functional level of distribution. In *F. T. C. v. Fred Meyer, Inc.*, 390 U.S.

341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968), a case under Section 2(d) involving promotional allowances, the Supreme Court held, on the facts of that case, that the competitive injury contemplated by Section 2(d) was that occurring on the same functional level of distribution. However, the Court noted that no such limitation is made in Section 2(a). The Court stated (pp. 356–57, 88 S.Ct. 904, p. 912):

> "We noted in *FTC v. Sun Oil Co.*, 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963), that when Congress wished to expand the meaning of competition to include more than resellers operating on the same functional level, it knew how to do so in unmistakable terms. It did so in § 2(a) of the Act by prohibiting price discrimination which may 'injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.'"

■ I hold that the type of competition engaged in by FLM with Ford dealers is within the protection of 2(a).[6]

I alluded earlier to the "target area" doctrine enunciated in such cases as *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). The target area doctrine has been applied in a case which involved, in part, the Robinson-Patman Act. *Billy Baxter, Inc. v. Coca-Cola Company*, 431 F.2d 183 (2d Cir. 1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971).

■ Applying the "target area" test to the present case, it would seem to be clear that FLM is within the target area of the alleged wrongful price discrimination practiced by Ford. The purpose of Ford's change of policy regarding the wholesale incentive allowance was to withdraw this price benefit from Ford dealers who sold to middlemen such as FLM. It was the obvious desire of Ford to cut the middleman out of the channel of distribution, and have the Ford dealers sell directly to the independent body shops. As Ford has candidly admitted in its Trial Memorandum filed in this action, FLM "is neither needed nor desired" in the distribution of Ford crash parts (p. 237).

I conclude therefore that FLM has standing to sue Ford claiming (1) that Ford discriminates in the price of crash parts in favor of Ford dealers who sell directly to independent body shops and against any Ford dealer who sells to FLM, and (2) that FLM is harmed by this discrimination in its attempt to compete with Ford dealers for the business of the independent repair shops.

FLM has urged, as alternative grounds for its standing under Section 2(a), the application of the so-called "indirect purchaser" doctrine or the somewhat related doctrine of *F. T. C. v. Fred Meyer, Inc.*, 390 U.S. 341, 88 S. Ct. 904, 19 L.Ed.2d 1222 (1968). I have

---

6. Section 2(a) has been held to apply to competitive injury occurring where the competitors are on different functional levels of distribution. *Purolator Products, Inc.*, 65 F.T.C. 8 (1964), *aff'd*, 352 F.2d 874 (7th Cir. 1965), *cert. denied*, 389 U.S. 1045, 88 S.Ct. 758, 19 L.Ed.2d 837 (1968). There the Commission found a competitive injury covered by Section 2(a), where jobbers competed with wholesale dealers from whom the jobbers purchased goods. The facts in *Purolator* were substantially different from the facts presented in the present case, and resort was had in *Purolator* to the "indirect purchaser" doctrine, which, for reasons described hereafter, I hold inapplicable to the present case. However, *Purolator* does illustrate the point that Section 2(a) can be applied, in an appropriate case, to a competitive injury where the competitors are not on the same functional level.

In *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), to be described more fully later in this opinion, the Supreme Court found a Sherman Act violation where General Motors combined with certain of its Chevrolet dealers to prevent other Chevrolet dealers from selling to discount houses, thereby preventing the discount houses from competing with dealers.

concluded that neither of these theories is applicable to the present case.

The indirect purchaser doctrine has been developed to cover situations where a defendant has *de facto* control over the purchase price paid for goods by parties more than one step removed from the defendant in the line of distribution. The basic idea is that if such a defendant in some way controls the prices to such customers by means of suggested price lists or otherwise, they become "indirect purchasers" from the defendant within the meaning of § 2(a). *American News Co. v. F. T. C.*, 300 F.2d 104 (2d Cir.), *cert. denied*, 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962); *Purolator Products, Inc.*, 65 F.T.C. 8, 32 (1964), *aff'd*, 352 F.2d 874 (7th Cir. 1965), *cert. denied*, 389 U.S. 1045, 88 S.Ct. 758, 19 L.Ed.2d 837 (1968); *Kraft-Phenix Cheese Corp.*, 25 F.T.C. 537 (1937). *Cf. F. T. C. v. Fred Meyer, Inc.*, 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968).

█ FLM argues that Ford "controls" the prices charged by a Ford dealer selling to FLM, so that the indirect purchaser doctrine applies. It is true that a Ford dealer is not likely to charge FLM less than what Ford has charged to the dealer. However, this is not the type of "control" which brings into play the indirect purchaser doctrine. Otherwise the doctrine would apply to every resale of goods. The crucial point in the present case is that Ford has never sought to suggest or influence in any way the markup charged by a Ford dealer to FLM. This is strictly a matter of negotiation between the Ford dealer and FLM. There is no "suggested" price to FLM, as there is in the usual case involving the indirect purchaser doctrine. *American News Co. v. F. T. C., supra; Purolator Products, Inc., supra; Champion Spark Plug Co.,* 50

F.T.C. 30, 44–45 (1953); *Dentists Supply Co. of New York,* 37 F.T.C. 345 (1943).

Moreover, it would be wholly inappropriate to apply the indirect purchaser doctrine in the present case, because FLM is not seeking, nor would there be any grounds for the court to require, an equalization of prices paid by FLM vis-a-vis competing Ford dealers.

I also conclude that *F. T. C. v. Fred Meyer, Inc.*, 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968), is not directly applicable to the present case. There the Supreme Court held that, in order to carry out the purposes of Section 2(d), a small retailer purchasing through a wholesaler should be considered to be a "customer" within the meaning of that section. The Court held that such a retailer was entitled to equal promotional allowances with a large direct-buying retailer. The Court emphasized that both retailers were on the same functional level of distribution.

The present case is distinguishable in an essential respect. The *Fred Meyer* doctrine was intended to equalize the position of the parties found by the Court to be customers. However, in the present case, as already noted in my discussion of the indirect purchaser doctrine, FLM is not seeking to obtain, nor could it properly be permitted to obtain, equalization of its prices with the prices paid by the Ford dealers.

### (b) *The Functional Discount Defense*

█ Given the fact that I have limited FLM's Robinson-Patman Act case to a claim for discrimination between Ford dealers, Ford has asserted only one defense on the merits.[7] This defense is that Ford's price differentials to the dealers constitute permissible functional discounts.

7. Proof of a price differential is prima facie proof of injury to competition within the meaning of Section 2(a). *Samuel H. Moss, Inc. v. F. T. C.*, 148 F.2d 378 (2d Cir.), *cert. denied*, 326 U.S. 734, 66 S.Ct. 44, 90 L.Ed. 438 (1945). It is further held that an injury to a competitor is sufficient proof of injury to competition. *F. T. C. v. Morton Salt Co.*, 334 U.S. 37, 49, 68 S.Ct. 822, 92 L.Ed. 1196 (1948).

Ford starts with the proposition that it is legal to charge a Ford dealer acting as a wholesaler less than a Ford dealer acting as a retailer. This is, of course, the basic price differentiation created by the wholesale incentive allowance for crash parts as it was originally promulgated in 1968.

Ford goes on to argue that, as the grantor of the wholesale incentive allowance, it has the legal right to define what the "wholesale function" is, and to define this function as referring only to *direct* sales by Ford dealers to independent repair shops, as distinct from indirect sales through an entity such as FLM. Ford's view is that when a dealer sells to FLM, it is not performing the wholesale function itself, but is merely delegating that function to FLM. Ford contends that it can validly withhold the wholesale incentive allowance as to any dealer who thus fails to directly perform the wholesale function.

■ I have concluded that Ford's notion of the extent of its powers with respect to functional discounts is contrary to Section 2(a) of the Robinson-Patman Act. Ford undoubtedly has the right to charge a different (lower) price for a crash part to a Ford dealer when that dealer resells the part at wholesale, than Ford charges for the part when the dealer resells at retail. This is a standard functional discount, where a supplier charges different prices to purchasers at different functional levels of distribution, and where the *higher* price is charged to the purchaser at the level *farther* from the supplier in the chain of distribution— i. e., the retailer is charged more than the wholesaler. This is a standard business practice and has been sanctioned by the legal authorities.

■ However, the situation is sharply different with respect to Ford's attempt to delineate the applicability of the wholesale incentive allowance in such a way as to deny the allowance when parts are sold to FLM, by charging a higher price to a dealer when it sells to FLM than Ford charges to a dealer when it sells directly to the independent repair shop. The pricing differential here is *not* between purchasers at different functional levels of distribution. Viewed realistically, the Ford dealer selling to FLM is on the *same* functional level as the Ford dealer selling to the independent repair shop. Both of these Ford dealers are in practical fact selling at the wholesale level, although one wholesales directly to independent repair shops and the other wholesales indirectly through FLM. At least it is clear beyond question that the Ford dealer which sells to FLM is not *retailing* the parts. But the prices which such a dealer must pay Ford for parts resold to FLM are the same prices as a dealer pays to Ford when he retails the parts.

Basically Ford's policy respecting the wholesale incentive allowance amounts to discrimination in prices charged to purchasers at the same functional level of distribution (the wholesale level) with the purpose and effect of limiting or inhibiting the type of resale trade engaged in by these purchasers. This is not valid functional discounting.

Neither the Robinson-Patman Act nor the original Section 2 of the Clayton Act, 38 Stat. 730 (1914), makes any express reference to functional discounts. However, in a case arising under Clayton Act § 2, the Second Circuit approved in dictum the practice of charging different prices to wholesalers and retailers because of no adverse effect on competition. *Mennen Co. v. F. T. C.*, 288 F. 774, 781 (2d Cir.), *cert. denied*, 262 U.S. 759, 43 S.Ct. 705, 67 L.Ed. 1219 (1923).

When the 1936 amendments to Section 2 of the Clayton Act were being considered, provisions about functional discounts were proposed in both the Senate and the House. The proposal in the Senate was as follows:

*"Provided,* That nothing herein contained shall prevent differentials in prices as between purchasers depend-

ing solely upon whether they purchase as factors, or wholesalers, or retailers, or consumers, or for use in further manufacture . . . ." 80 Cong.Rec. 6428 (1936).

The proposal in the House was:

"That nothing herein contained shall prevent or require differentials as between purchasers depending solely upon whether they purchase for resale to wholesalers, to retailers, or to consumers, or for use in further manufacture; for the purpose of such classification of customers as wholesalers or jobbers, or retailers, the character of the selling of the purchaser and not the buying shall determine the classification, and any purchaser who, directly or indirectly, through a subsidiary or affiliated concern or broker, does both a wholesale and retail business shall, irrespective of quantity purchased, be classified (1) as a wholesaler on purchases for sale to retail dealers only, not owned or controlled, directly or indirectly, by the purchaser; and (2) as a retailer on purchases for sale to consumers." H.R.Rep.No.2287, 74th Cong., 2d Sess. 1–2 (1936).

However, reference to functional discounts was entirely omitted from the Robinson-Patman Act as finally passed. This omission was apparently the result of farm opposition, based on the fear of disadvantages to farmers' cooperatives. 80 Cong.Rec. 8113, 8139 (1936).

The Congressional refusal to enact an express sanction for functional discounts has not been interpreted as indicating an intent to absolutely prohibit such discounts. It is assumed that Congress intended functional discounts to be judged under the general provisions of the statute in the same way as other pricing differentials, without any special treatment. Shniderman, *"The Tyranny of Labels"—A Study of Functional Discounts Under the Robinson-Patman Act,* 60 Harv.L.Rev. 571 (1947); Kelley, *Functional Discounts Under the Robinson-Patman Act,* 40 Calif.L.Rev. 526

(1952); Rowe, *Price Discrimination Under the Robinson-Patman Act,* 173 (1962).

The basic test for the validity of a functional discount is whether there is an injury to competition. The Rowe text states (*Ibid.*):

"The nature of the competition between the customers paying the higher and the lower prices is the key to the legality of 'functional discounts' or trade price differentials under the Robinson-Patman Act."

In general, it is accepted both from an economic and a legal standpoint, that a valid functional discount is one where the lower price is charged to the functional level nearer to the supplier, and the higher price is charged to the functional level farther from the supplier— i. e., where distributors pay less than wholesalers, and wholesalers pay less than retailers. The Rowe text describes it as follows (*Id.* at 174):

"In practice, the competitive effects requirement permits a supplier to quote different prices between different distributor classes—so long as those who are higher up (nearer the supplier) on the distribution ladder pay *less* than those who are further down (nearer the consumer). Put another way, wholesalers or jobbers (or their equivalent) may receive greater discounts or lower prices than retailers or dealers—so long as the wholesalers or jobbers sell only *to* retailers or dealers but not to consumers *in competition with* the retailers paying more."

This is basically the view taken by the Federal Trade Commission, as expressed in *Doubleday and Co., Inc.,* 52 F.T.C. 169, 207–208 (1955), and *General Foods Corp.,* 52 F.T.C. 798 (1956). In *General Foods* the Commission stated (*Id.* at 824):

"While the Robinson-Patman Act does not mention functional pricing, it was written nevertheless against the background of the distribution

system then in effect. As pointed out by respondent, a seller is not forbidden to sell at different prices to buyers in different functional classes and orders have been issued permitting lower prices to one functional class as against another, provided that injury to commerce as contemplated in the law does not result."

However, I hold that neither the statute nor the authorities interpreting it sanction the price differentials of Ford complained about by FLM. As described earlier, Ford is discriminating in price between Ford dealers who are operating at the *same* functional level of distribution. Ford does this for the specific purpose of inhibiting sales to middlemen such as FLM and for the purpose of discouraging such middlemen from competing in the distribution of crash parts.

Ford contends that it should not be compelled to make provision in its distribution system for what it regards as a superfluous intermediary such as FLM. Ford contends that it should not be required to give a wholesale incentive allowance to a Ford dealer who fails to perform a "wholesale function" and merely delegates this responsibility to FLM. These contentions do not provide a valid defense to Ford.

FLM is not seeking to have Ford set up any special or unique discount—such as a distributor's discount—for Ford dealers who sell to FLM. FLM is not seeking to have any "suggested" price for sales by Ford dealers to FLM, which would establish FLM as a part of Ford's regular, contemplated distribution system. What FLM is seeking is simply to have Ford charge the same wholesale price to its dealers whether they sell to FLM or directly to an independent body shop. FLM is seeking the opportunity to purchase crash parts from Ford dealers, and to freely participate in competition for the distribution of these parts, without the positive hindrance presented by Ford's price discrimination.

█ I also reject the contention of Ford that Ford can charge a higher price

for crash parts to a Ford dealer because Ford views that dealer as not performing the "wholesale function" when it is selling to FLM. A Ford dealer buying parts for wholesale should be basically free to choose its own channels of distribution—*i. e.*, be free to decide whether it will sell directly to an independent repair shop or sell to a middleman such as FLM who in turn sells to the independent repair shop. Moreover, a company such as FLM should be free to purchase from the Ford dealer and to compete, through offering superior service, for the business of the independent repair shops.

The case of *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), is instructive in this regard. Although this case was brought under Section 1 of the Sherman Act, it illustrates the type of competitive interests which are involved in the present case. There General Motors had combined with franchised Chevrolet dealers in Los Angeles to prevent discount houses from purchasing cars from certain franchised dealers. The discount houses were competing with the dealers in the retail sales of Chevrolet cars. The Supreme Court held that this was an illegal restraint of trade in that it was calculated "to deprive franchised dealers of their freedom to deal through discounters if they so choose" (*Id.* at 140, 86 S.Ct. at 1328). The Court further described the fact that there was action by the defendants "to eliminate the discounters from participation in the market, to inhibit the free choice of franchised dealers to select their own methods of trade . . ." (*Id.* at 144, 86 S.Ct. at 1330).

These passages describe the basic vice of Ford's actions in the present case. Ford's revised wholesale incentive policy was designed to discourage franchised Ford dealers in their freedom to deal through middlemen such at FLM if they so choose. Moreover, Ford's revised policy necessarily has the ultimate effect of eliminating, or sharply curtailing,

middlemen such as FLM from participation in the market.

I referred earlier to Ford's evidence that two of its considerations giving rise to the amendment in its wholesale incentive allowance rules were the concern that a middleman such as FLM might operate as a conduit between Ford dealers, and the concern that a Ford dealer selling to such a middleman would seek a special distributor's allowance. The fact is, as I have found, that nothing in connection with the activities of FLM, or the Ford dealers' sales to FLM, provided the slightest basis for either of these concerns. Ford does not really argue to the contrary. Ford's contention is that these were concerns respecting *other* parties and other areas of Ford's spare parts business, giving rise to the need for general rules and regulations, which perchance apply to FLM.

This situation constitutes no valid justification, under the statute or the applicable authorities, for the anti-competitive price discrimination which Ford has instituted. This is particularly true in view of the fact that there is no evidence of any real attempt by Ford to solve its alleged problems by means that do not involve price discrimination.

For these reasons, I hold that Ford's discrimination in the price of crash parts between Ford dealers who wholesale directly to independent repair shops and Ford dealers who sell to middlemen such as FLM is a violation of Section 2(a) of the Robinson-Patman Act and does not constitute valid functional discounting.

*Sherman Act*

I hold that FLM has not made out a valid case under either Section 1 or Section 2 of the Sherman Act.

For its Section 1 claim, FLM relies on cases such as *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967) and *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), involving agreements between a supplier and its dealers or distributors fixing re-

sale prices and allocating territories. The short answer to this argument is that no such agreement has been shown by the evidence in this case.

The illegal activity of Ford is in the setting of discriminatory prices it charges to dealers selling to FLM. The sole activity of the dealers vis-a-vis Ford is to pay the prices charged by Ford. FLM has not proved the existence of any agreement between Ford and any dealers that the dealers would not sell to FLM. Indeed certain Ford dealers are still selling to FLM. There is no evidence that any Ford dealers have entered into an agreement with Ford as to what prices the dealers will charge to FLM. The dealers pay Ford the prices charged by Ford, and then sell to FLM at a markup above these prices—the markup being negotiated with FLM. This is by no means a resale price agreement within the meaning of the authorities.

In support of its Section 1 claim FLM urges that there was a combination or conspiracy between defendant Ford Motor Company and defendant Ford Marketing Corporation. There is no evidence to support this contention. Ford Marketing Corporation did not come into existence until 1970. It assumed the marketing responsibility for Ford automobiles and parts commencing in July 1970. Ford Marketing Corporation was, of course, in existence during 1971 and 1972 when the events complained of in this action occurred. The essential point is that the relevant actions with respect to the wholesale incentive discount were undertaken, as far as the evidence shows, solely by personnel in the marketing arm of Ford, whether this arm was a division within Ford Motor Company or was a separate corporation, Ford Marketing Corporation. There is no evidence of any combination or conspiracy between the two corporations.

For its Sherman Act § 2 claim, FLM relies upon cases such as *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927), and *Poster Exchange, Inc. v.*

*National Screen Service Corp.*, 431 F.2d 334 (5th Cir. 1970), holding that Section 2 prohibits the use of monopoly power on one level of distribution to destroy competition on another level. *See also Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973)·; *United States v. Aluminum Co. of America*, 148 F.2d 416, 437–39 (2d Cir. 1945).

However, these cases involved vertical integrations between the two levels. In *Kodak,* the defendant manufactured film products and owned the retail stores that sold these products in competition with plaintiff. In *Otter Tail* the defendant generated power, and distributed it through its own retail distribution system, which sold power in competition with municipally owned retail distribution systems.

 In the present case Ford distributes automobiles and crash parts, but it does not own the franchised dealers who wholesale these parts in competition with FLM. The exception to this is the so-called dealer development franchise, where Ford has a temporary ownership interest in the dealer for financing pur·poses. However, the evidence in this case about dealer development franchises is fragmentary and is hardly sufficient to permit a finding of vertical integration between Ford and its dealers.

On the basis of the record in the present case as a whole, I decline to extend the rule of the *Eastman Kodak Co.* case and the other cases referred to above to cover the situation of Ford and its franchised dealers.

### Ford's Refusal to Sell Directly to FLM

 FLM has advanced the contention (although not forcefully) that Ford has violated the antitrust laws in refusing to sell crash parts directly to FLM rather than selling exclusively to franchised Ford dealers. I reject this contention for reasons which I will set forth briefly.

Section 2(a) of the Robinson-Patman Act expressly provides:

"· . . That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade; . . ."

Based on well-established law, Ford had the right to distribute automobiles and crash parts manufactured by it solely to franchised dealers. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Atalanta Trading Corp. v. F. T. C.*, 258 F.2d 365, 372–73 (2d Cir. 1958); *Naifeh v. Ronson Art Works*, 218 F.2d 202 (10th Cir. 1954); *Chicago Seating Co. v. S. Karpen & Bros.*, 177 F.2d 863 (7th Cir. 1949).

I have already held that it is illegal for Ford, by means of price discrimination, to inhibit a dealer from selling to a middleman such as FLM, and to inhibit FLM from freely purchasing crash parts from a Ford dealer in order to compete in the distribution process. With this price discrimination removed, Ford is free to restrict its sales to its dealers. There is ample evidence of valid economic and administrative justification for such restriction.

### Conclusion

FLM is entitled to injunctive relief and damages on its claim of price discrimination under Section 2(a) of the Robinson-Patman Act. FLM is entitled to no relief or recovery under its other antitrust claims. Following the completion of the record as to the amount of damages, there will be a supplemental opinion on that subject.