Mendel SCHWIMMER d/b/a Supersonic Electronics Co., Plaintiff-Appellant,

v.

SONY CORPORATION OF AMERICA and Sony Corporation, Defendants-Appellees.

No. 638, Docket 79–7665.

United States Court of Appeals, Second Circuit.

Argued Jan. 23, 1980.

Decided July 10, 1980.

Bass, Ullman & Lustigman, New York City (I. Scott Bass, New York City, of counsel), for plaintiff-appellant.

Rosenman, Colin, Freund, Lewis & Cohen, New York City (Asa D. Sokolow, Steven A. Asher, Brian G. Lustbader, New York City, of counsel), for defendants-appellees.

Before FEINBERG, Chief Judge, SMITH,* Circuit Judge, and OWEN, District Judge.**

OWEN, District Judge:

Mendel Schwimmer, the sole proprietor of plaintiff-appellant Supersonic Electronics Company (Supersonic), a seller of televisions and other electronic appliances, appeals from two orders of the United States District Court for the Eastern District of New York, one granting summary judgment to defendant-appellee Sony Corporation of America (Sonam) on its counterclaim against Supersonic to recover monies paid on the basis of false advertising claims, and the other granting summary judgment to defendant-appellee Sony Corporation (Sony), the Japanese parent of Sonam, dismissing Supersonic's price discrimination claims against it.[1]

Sony is a major Japanese manufacturer of consumer electronic products which are sold in the United States exclusively through Sony's wholly-owned subsidiary, Sonam.[2] Supersonic, located in Brooklyn, New York, was an authorized Sony dealer from December 1975 until April 1977. During that period, with a few exceptions, Supersonic purchased all of its Sony-brand products from Sonam. In its first year as a Sony dealer, Supersonic sold over $3,000,000 worth of Sony-brand products, and its sales, made throughout the United States, continued to increase in the following years.

Supersonic attributed its success with Sony-brand products to its marketing practices. First, it sold primarily to other Sony dealers, at prices below those offered by Sonam and its distributors. This practice, known as transshipping, enabled Supersonic to make high volume sales at a low profit margin. Second, appellant did not restrict its sales to the Sonam Eastern Region which is comprised of New York, New Jersey, and other East Coast States.[3]

---

* Pursuant to § 0.14 of the Rules of this Court, this appeal is being determined by Judges Feinberg and Owen, who are in agreement on this opinion. Judge Smith, who heard the argument, unfortunately died on February 16, 1980, and did not have the opportunity to see this opinion prior to his death.

** Honorable Richard Owen, District Judge of the Southern District of New York, sitting by designation.

1. The former decision, dated May 25, 1979, is unreported; the latter, dated May 2, 1979, is reported at 471 F.Supp. 793 (E.D.N.Y.1979).

2. Sony sells its products outside of the United States either through authorized or independent dealers.

3. Sonam allegedly received complaints from its customers and employees in territories outside of its Eastern Region, and from local Sonam executives, about appellant's transshipping and interregional sales practices. In response to

In 1977, Sonam terminated its dealer agreement with Supersonic. Shortly thereafter, appellant brought this action under the federal antitrust laws contending, *inter alia,* that the termination resulted from Sonam's opposition to Supersonic's transshipping and geographically unrestricted resale practices. The complaint alleged that Sonam had conspired with certain of its dealers and distributors to employ anticompetitive devices restricting Supersonic's legitimate marketing practices in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 2(a), (d) and (e) of the Robinson-Patman Act, 15 U.S.C. §§ 13(a), (d) and (e). Supersonic's claims against Sonam are not the subject of this appeal.

In 1977, Supersonic filed an amended complaint in which it first asserted certain independent antitrust claims directly against Sony, the parent corporation. The amended complaint alleges *inter alia,* that Sony violated the price discrimination provisions of the Robinson-Patman Act, 15 U.S.C. § 13(a), by selling certain products to one dealer, Interocean Industries, Inc. (Interocean), at prices below those charged to Sonam.[4]

Sonam's answer to the complaint denied all the material allegations, and interposed a counterclaim in the amount of $54,133.50. The counterclaim sought repayment of certain monies allegedly wrongfully obtained by Supersonic through the submission of falsified advertising claims to Sonam.

The District Court, in successive orders, dismissed the amended complaint as to Sony, and granted Sonam's motion for summary judgment on its counterclaim.[5] This appeal followed.

these complaints, Sonam made an effort to limit Supersonic's activities. For example, Sonam purportedly notified appellant that it had to cease selling in the Florida and Texas regions. In addition, it is claimed that Sonam tightened credit and limited the supply of popular television models to transshippers.

4. Supersonic claims to have been injured by the alleged price discrimination because it is both a customer of Sonam, and a competitor of Interocean and Interocean's customers. Wherever else Interocean may have sold, the record reveals that it is Sony's distributor for Central and South America.

## I. *Sonam's Counterclaim Against Supersonic.*

The undisputed facts in support of Sonam's motion for summary judgment on its counterclaim are as follows. Sonam conducted a cooperative advertising program with its dealers in order to promote the advertisement of Sony-brand products, and each year Sonam distributed a manual containing the terms and conditions of the program. The 1976 Manual, which Supersonic received,[6] provided that dealers would receive credit for advertising costs in amounts up to 4% of the dealers' net annual purchases of Sony-brand merchandise. Refunds for an individual advertisement were not to exceed 75% of the actual cost to the dealer of running these advertisements.

The procedure for obtaining the advertising credits was fully set forth in the 1976 Manual. Dealers were required to submit a signed proof of claim representing their actual expenditures for advertising Sony-brand products. The proof of claim was to contain a full description of the nature and cost of the advertisements which were run, along with all of the invoices for the advertising services. In connection with proof of claims for radio advertisements, a dealer was required to submit the scripts of the advertisements, as well as an affidavit from the radio station confirming the fact that the advertisements had been run on the dates and times indicated on the proof of claim form.

Supersonic participated in Sonam's cooperative advertising program to the extent

5. In its memorandum decision of May 2, 1979, the District Court also dismissed Supersonic's claim against Sony under the Anti-Dumping Act of 1916, as well as Supersonic's common law claims against Sony for unfair competition and unfair trade practices. Supersonic has not appealed from the dismissal of those claims.

6. The record contains a certificate signed by Mendel Schwimmer dated February 1976 confirming that he received a copy of the 1976 Manual from a Sonam representative who explained its terms to him.

that it submitted the appropriate forms purporting to be accurate accounts of its advertising expenses, and received credits according to the terms of the 1976 Manual. In or about April 1977, Sonam discovered that an advertising agency known as Computer Cast had submitted, on Supersonic's behalf, four falsified proof of claims for radio advertisements. The advertisements described on the forms had never been run, and Supersonic had not incurred any of the expenses claimed. On the basis of these fraudulent proofs of claim, Supersonic had received credits from Sonam in the amount of $54,133.50, or 65% of the expenses it claimed to have paid.

Through its own investigation, Sonam also learned that Supersonic was one of nine authorized Sonam dealers in the New York metropolitan area which had submitted false claims through Computer Cast and had received credits for non-existent advertisements. Sonam suspended all of these dealers temporarily, and requested that they assist Sonam in an investigation of the circumstances under which the falsified claims had been prepared and submitted. In addition, the dealers were asked to return to Sonam the money that had been credited to their accounts in satisfaction of the false claims. Seven of the dealers complied with these requests and resumed normal business activities with Sonam. One other dealer initially agreed to repay the monies owed but then withheld payment and was subsequently terminated. Supersonic refused from the outset to cooperate with Sonam. It neither assisted in the investigation nor refunded the money credited to its account on the basis of the false claims. Supersonic was thereafter terminated, whereupon it commenced this action.

Supersonic does not dispute the fact that it submitted claims for advertising expenses

that, in fact, were never incurred.[7] Its defense to Sonam's counterclaim is that there was an agreement between Sonam and its dealers, including Supersonic, to treat the cooperative advertising program as a sham in order to provide the dealers with an automatic 4% discount on purchases of Sony-brand products. Supersonic maintains that Sonam understood that the forms submitted in accordance with the terms and conditions of the 1976 Manual would not reflect actual advertising expenditures. The Manual procedures were utilized, Supersonic contends, to avoid liability for providing hidden discounts to authorized Sonam dealers in violation of federal anti-dumping statutes and the Robinson-Patman Act.

■ Supersonic's appeal from the District Court's order granting summary judgment is based on its contention that there is an issue of fact as to the terms of the agreement between the parties. See *Union Insurance Society of Canton Ltd. v. William Gluckin & Co., Inc.*, 353 F.2d 946, 952 (2d Cir. 1965). The court below found no evidence in the record to contradict appellee's version of the parties' agreement as set forth in the 1976 Manual. Supersonic disputes this finding. First, it argues that certain affidavits and deposition testimony establish that prior to 1977 Sonam never conscientiously enforced the advertising program. Appellant refers specifically to the affidavit of a former Sonam employee, Joseph Sadowy, who was in charge of Sonam's Eastern Region for several years up to April 1977. Sadowy's affidavit states that in the period before 1976, "the rebate was available to any dealer as long as the completed form was submitted to Sonam." It appears that a new program was instituted in March 1976 requiring verification of such advertising claims. In this connection, Supersonic tenders Sadowy's conclusory ob-

---

7. There is ample proof in the record on this point as well. In the four proof of claims in question, Supersonic represented that it paid for numerous advertisements for Sony-brand products which had been run on radio stations WJIT–AM and WKTU–FM. The general managers for those stations testified on deposition that, according to their records, no such advertisements had been run. In addition, they testified their stations never issued the "affidavits" submitted by Supersonic on the standard forms used by WJIT–AM and WKTU–FM confirming that the advertisements had been run.

servation in his affidavit that "[i]n reality, nothing changed."[8] Supersonic also points to the deposition of Murray Gidseg, the executive director of a major Sonam customer, in which he testified that prior to the institution of the verification requirements in March 1976, advertising rebates were obtained by submitting "fluffies," i. e., unsubstantiated claims for reimbursement. Also, Supersonic relies on the affidavit of Mendel Schwimmer which was submitted in opposition to Sonam's summary judgment motion. Schwimmer's affidavit, hearsay in all material respects,[9] states that on the basis of information obtained from other Sonam dealers and the Sonam salesmen servicing his account, he understood from the inception of his franchise that the forms required to be submitted for reimbursement of advertising expenses "never were expected to reflect the true amounts expended."

Standing alone, the testimony of Sadowy and Gidseg as to Sonam's ineffective policing of the advertising program does not amount to evidence of an agreement between Supersonic and Sonam to treat the terms of the 1976 Manual as a nullity or sham. It may be that Sonam did not regularly check or confirm the accuracy of the proof of claim forms submitted by dealers. This does not support a claim of an agreement between Sonam and its dealers to engage in a fraudulent scheme to provide an automatic 4% discount on the basis of falsified advertising claims. While it is true that Schwimmer's hearsay affidavit would, if competent and credited, be some evidence of such an agreement, we also note that it directly contradicts his earlier deposition testimony:

Q. You thought it [the advertising] ran?

A. I thought the advertising was run.

Q. And you don't know whether your advertising, in fact, ran on WJIT?

A. I assume it was run.

Q. You assumed it was?

A. It was run.

Q. You assumed is what you said.

A. I never heard it myself.

Q. So you don't know.

A. For a fact, up until April since Sony[10] approved it and he was with Sony I know it was run.

Q. You thought it was run?

A. It was run, yes.

\* \* \* \* \* \*

A. Up until April '77, I knew it was run.

Q. How did you know it was run up to April 1977?

A. Because Norman King [the agent] told me and Sony gave me an approval.

Q. So you assumed it was running?

A. Yes.

\* \* \* \* \* \*

A. I assumed once I got advertising credit—I assumed it actually ran.

We also observe that Mr. Schwimmer in his earlier deposition testimony believed the advertisements were run not only on the basis of what the advertising agent told him, but also because he assumed Sonam would not otherwise have issued the credit. From this testimony, one would necessarily conclude that, in Schwimmer's mind, neither Supersonic nor Sonam had any intention of disregarding the terms of the 1976 Manual. Since the District Court could properly rely on Schwimmer's earlier deposition testimony, as opposed to his later conflicting hearsay affidavit, *Perma Research and Development Co. v. Singer Co.*, 410 F.2d 572, 577 (2d Cir. 1969), it correctly concluded that there was no genuine issue of fact barring Sonam from recovering the $54,133.50 credited to Supersonic on the basis of fraudulent submissions.

8. The record reveals that Sadowy, who was charged with supervising the advertising program, was discharged by Sonam when the matter of the cooperative advertising fraud was discovered.

9. A hearsay affidavit is a nullity on a motion for summary judgment. *Kern v. Tri-State Insurance Co.*, 386 F.2d 754, 756 (8th Cir. 1967).

10. The references to "Sony" in this quotation from the Schwimmer deposition are to Sonam.

II. *Supersonic's Robinson-Patman Act Claim Against Sony.*

Supersonic also appeals from the dismissal of its claim that Sony violated § 2(a) of the Robinson-Patman Act. One issue alone is presented: whether Supersonic has standing under § 4 of the Clayton Act to assert this claim.

The District Court concluded that Supersonic lacked standing to assert a claim against Sony because Supersonic was not within the "target area" of Sony's alleged price discrimination between Sonam and Interocean. In granting Sony's motion for summary judgment, the court below found no evidence (1) that Supersonic was a direct purchaser of Sony, or (2) that Sony's alleged price discrimination between Sonam and Interocean was directed at Supersonic, or (3) that Sony controlled subsequent resale prices by Sonam or others purchasing from Sony.[11]

Appellant first contends that, as a non-direct purchaser, it has standing to sue Sony because it *was* within the "target area" of the alleged price discrimination. *See Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292 (2d Cir. 1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). Further, appellant takes the position that secondary purchasers have automatic standing to sue any discriminating seller who distributes its products to the secondary market through wholly-owned subsidiaries.[12] We disagree.

Section 2(a) of the Robinson-Patman Act prohibits price discrimination between competing purchasers. That section provides, in pertinent part, that

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce . . . and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . .

15 U.S.C. § 13(a). Standing to raise a claim under Section 2(a) is derived from Section 4 of the Clayton Act, 15 U.S.C. § 15, which provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor" and recover treble damages and costs and a reasonable attorneys' fee. The language of Section 4 of the Clayton Act is quite broad and could be read to confer standing to assert claims under § 2(a) of the Robinson-Patman Act on purchasers who are only indirectly or incidentally injured by a seller's price discrimination between direct purchasers. However, courts have recognized the need to limit the scope of Section 4 by establishing "practical rules of standing . . . [to] exclude remote parties with possibly speculative injuries." *Long Island Lighting Co. v. Standard Oil Co. of California,* 521 F.2d 1269, 1273 (2d Cir. 1975), *cert. denied,* 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1976); *see also, Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292, 1295 (2d Cir. 1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). Thus, it is recognized that treble damage actions, effective and

---

11. The court below also observed that Supersonic did not explain why it did not purchase from Interocean instead of Sonam, and thereby reap the benefits of Interocean's price advantage. 471 F.Supp. at 794. The absence of such proof tends to negate appellant's claim as to the anti-competitive effect on Supersonic of Sony's alleged price discrimination between Sonam and Interocean. *See Tri-Valley Packing Association v. F. T. C.,* 329 F.2d 694, 703–704 (9th Cir. 1964).

12. Appellant makes much of Sony's observation that it would be absurd to presume that Sony intended to discriminate against Sonam, its wholly owned subsidiary. Reply Memorandum of Defendant Sony Corporation at 9, n.4. Supersonic argues that since Sony concedes that its price discrimination was not aimed at Sonam, it must have been directed at Supersonic and other secondary-line purchasers.

attractive as they are in deterring violations of the federal antitrust laws, must have some boundaries. Consequently, the standing requirement is designed, in essence, to limit access to treble recovery to a target of the anticompetitive conduct. Thus, the standing rules exclude a non-target whose damages are more difficult to prove and, in all likelihood, highly speculative. Where, as here, the substantive law provides few "bright lines" separating permissible from impermissible conduct, it is especially important to have clear standing rules in order to avoid abuses of the Clayton Act's private enforcement remedy.

■■■ *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.* enunciates the following rule:

> . . . in order to have "standing" to sue for treble damages under § 4 of the Clayton Act, a person must be within the "target area" of the alleged antitrust conspiracy, i. e., a person against whom the conspiracy was *aimed*, such as a competitor of the persons sued. Accordingly we have drawn a line *excluding* those who have suffered economic damage by

virtue of their relationships with "targets" or with participants in an alleged antitrust conspiracy, rather than by being "targets" themselves.

*Id.* at 1295 (emphasis added).[13] Courts have examined whether the plaintiff suffered a "direct" injury as opposed to an "incidental," "indirect" or "remote" injury. *See, e. g., Productive Inventions, Inc. v. Trico Products Corp.*, 224 F.2d 678, 680 (2d Cir. 1955), *cert. denied*, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956); *Long Island Lighting Co. v. Standard Oil Co., supra*, at 1274.[14] While courts frequently focus on the purpose of the antitrust conspiracy, specifically whether it was "aimed at" the one claiming injury, we do not conclude that a requirement of specific intent should be read into the "target area" test.[15] As the Ninth Circuit stated in *Twentieth Century Fox Film Corp. v. Goldwyn*, 328 F.2d 190, 220 (9th Cir.), *cert. denied*, 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964):

> [I]n using the words "aimed at" this court did not mean to imply that it must have been a purpose of the conspirators to

**13.** Typically, the "target area" test has been applied to deny standing to those who claim to have suffered a derivative harm as a result of their relationship to the person or entity which was the object of the antitrust conspiracy. *See Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc., supra* (nonoperating landlord of motion picture theatres leased to exhibitor outside "target area" of conspiracy between distributors and exhibitors to restrain competition in the exhibition of motion pictures); *Productive Inventions, Inc. v. Trico Products Corp.*, 224 F.2d 678 (2d Cir. 1955), *cert. denied*, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956) (standing denied to patent owner allegedly injured by conspiracy directed at its licensees); *Billy Baxter, Inc. v. Coca-Cola Company*, 431 F.2d 183 (2d Cir. 1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826, *rehearing denied*, 401 U.S. 1014, 91 S.Ct. 1250, 28 L.Ed.2d 553 (1971) (franchisor denied standing to assert claim of an antitrust combination aimed at its franchisee); *Fields Productions, Inc. v. United Artists Corp.*, 432 F.2d 1010 (2d Cir. 1970), *affirming*, 318 F.Supp. 87 (S.D.N.Y.1969), *cert. denied*, 401 U.S. 949, 91 S.Ct. 932, 28 L.Ed.2d 232 (1971) (motion picture producer lacked standing to sue television distributor who engaged in "block booking" of the producer's films to gain competitive advantage over other television stations and distributors).

**14.** One antitrust commentator has observed that the "target area" test is preferable to the rigid "direct injury" rule because it focuses on the nature of the particular antitrust violation and the area of competition the defendant knew or should have known would be adversely affected. J. O. Kalinowski, Antitrust Laws and Trade Regulation, vol. 13, ch. 101.02[2], at 101–18 (1980).

**15.** Thus, we decline to adopt the District Court's interpretation of § 4 of the Clayton Act to the effect that "where the seller's specific aim has not been at customers further down the line . . . pragmatic considerations . . . suggest that the right to bring a treble damage action be restricted to the initial purchaser or a competing seller." *Schwimmer v. Sony Corporation of America*, 471 F.Supp. 793, 796 (E.D.N.Y.1979). Thus, while evidence of a seller's specific intent to restrain trade among indirect purchasers necessarily confers standing on those more remote customers, we conclude that the absence of such evidence does not automatically exclude indirect purchasers from the "target area" of an antitrust conspiracy.

injure the particular individual claiming damages. Rather, it was intended to express the view that the plaintiff must show that, whether or not then known to the conspirators, plaintiff's affected operation was actually in the area which it could reasonably be foreseen would be affected by the conspiracy. This is made clear by our quotation, in Karseal, of this excerpt from the opinion in *Conference of Studio Unions v. Loew's Inc.*, 9 Cir., 193 F.2d 51, 54–55:

> "A conspiracy may have many purposes and objects; the conspirators may perform an almost infinite variety of acts in furtherance of the conspiracy; but, in order to state a cause of action under the anti-trust laws a plaintiff must show more than that one purpose of the conspiracy was a restraint of trade and that an act has been committed which harms him. He must show that he is within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry. Otherwise he is not injured 'by reason' of anything forbidden in the anti-trust laws."

█ Further, the "aimed at" language of the "target area" test has also been discussed in terms of causation. *Contreras v. Grower Shipper Assn. of Central California*, 1971 Trade Cas. ¶ 73,592 (N.D.Cal.1971), *aff'd per curiam*, 484 F.2d 1346 (9th Cir. 1973), *cert. denied*, 415 U.S. 932, 94 S.Ct. 1445, 39 L.Ed.2d 490 (1974); *see also Twentieth Century Fox Film Corp. v. Goldwyn*, 328 F.2d 190, 220 (9th Cir.), *cert. denied*, 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964), *discussing, Karseal Corp. v. Richfield Oil Corp.*, 221 F.2d 358, 362 (9th Cir. 1955). In *Contreras*, farm workers engaged in growing, harvesting and processing lettuce al-

leged that certain growers and shippers of iceberg lettuce and their trade association violated §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 by conspiring to raise the price of iceberg lettuce by limiting its production and dividing the market, thereby reducing the amount of work available to the plaintiffs. The plaintiffs sought damages for lost job opportunities caused by the defendants' cutbacks in lettuce production. The court, in denying the plaintiffs standing to sue, properly observed that the standing requirement of § 4 of the Clayton Act excludes suits by persons whose injury "was not necessary to achieve the purposes of the conspiracy, even though it may have followed as a logical result of the other acts [in furtherance of the conspiracy]." *Id.* at 90,453.

From the foregoing analysis, we turn to the issue before us: at what point in a distribution chain does the injury from price discrimination become too remote to permit an indirect purchaser to sue under § 4 of the Clayton Act? Clearly, the first level purchaser has standing to sue by virtue of the "direct" injury inflicted upon it. *See, e. g., Klein v. Lionel Corp.*, 237 F.2d 13 (3d Cir. 1956); *see also, Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 488–90, 88 S.Ct. 2224, 2228–2229, 20 L.Ed.2d 1231 (1968). However, the impact of price discrimination on an indirect purchaser at a subsequent level is more difficult to assess. Courts are not permitted to assume that the original seller's overcharge is automatically passed on to successive customers. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).[16] Nevertheless, a court must guard against a situation in which a seller interposes a middleman as a shield against antitrust liability,[17] especially where the middle-

---

**16.** As the Supreme Court stated in *Illinois Brick*, permitting the use of a pass-on theory would create "a strong possibility that indirect purchasers remote from the defendant would be parties to virtually every treble-damage action . . . ." *Illinois Brick Co. v. Illinois, supra*, at 741, 97 S.Ct. at 2072. Cf. *FLM Collision Parts, Inc. v. Ford Motor Co.*, 406 F.Supp. 224, at 237–38 (S.D.N.Y.1975), *aff'd in part on other grounds, rev'd in part on other grounds*,

543 F.2d 1019 (2d Cir. 1976), *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977), a pre-*Illinois Brick* case in which the district court indicated that indirect purchasers as well as direct purchasers should have standing to sue a discriminating seller for treble damages.

**17.** In *American News Co. v. FTC*, the court was faced with the question of whether a magazine supplier could be sued by a secondary purchas-

man is a subsidiary of the seller.[18] Thus, an indirect purchaser is considered a "target" of a seller's price discrimination if there is evidence that the discrimination was "aimed at" the indirect purchaser by virtue of the nature and foreseeable effect of the antitrust conspiracy. Relevant factors to consider in this connection are the anticompetitive purpose or object of the seller's price discrimination, *see, e. g., FLM Collision Parts, Inc. v. Ford Motor Co.*, 406 F.Supp. 224 (S.D.N.Y.1975), *aff'd in part on other grounds, rev'd in part on other grounds*, 543 F.2d 1019 (2d Cir. 1976), *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977), and the seller's control over the resale price to the indirect purchaser. *See American News Co. v. FTC*, 300 F.2d 104 (2d Cir.), *cert. denied*, 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962).

 We conclude that the District Court was correct in its determination that Supersonic has no standing to pursue this action against Sony since the uncontradicted record amply supports its conclusion that Supersonic was not in the "target area" of Sony's alleged price discrimination.

 Appellant argues, in the alternative, that Supersonic should be considered a direct purchaser from Sony under the single-entity doctrine. *See* F. Rowe, Price Discrimination Under the Robinson-Patman Act, 53–57 (1962), and Supp. nn.35–42 (1964). Supersonic contends that the court below failed to consider the issue of whether Sony and its wholly-owned subsidiary, Sonam, constitute a single sales entity for purposes of the Robinson-Patman Act. *Compare, Bain & Blank, Inc. v. Philco Corp.*, 148 F.Supp. 541 (E.D.N.Y.1957), *with Reines Distributors, Inc. v. Admiral Corp.*, 256 F.Supp. 581 (S.D.N.Y.1966). Supersonic, however, did not raise this issue in its pleadings or motion papers, and therefore is precluded from raising it for the first time on appeal. *Grace Towers Tenants Ass'n v. Grace Housing Development Fund Co.*, 538 F.2d 491, 495 (2d Cir. 1976); *Capps v. Humble Oil & Refining Co.*, 536 F.2d 80, 82 (5th Cir. 1976); *National Equipment Rental, Ltd. v. Stanley*, 283 F.2d 600, 603 (2d Cir. 1960); *Parenzan v. Iino Kaiun Kabushiki Kaisya*, 251 F.2d 928, 930 (2d Cir.), *cert. denied sub nom., International Terminal Operating Co. v. Iino Kaiun Kaisha, Ltd.*, 356 U.S. 939, 78 S.Ct. 781, 2 L.Ed.2d 814 (1958). Further, we note that the single-entity theory was not raised implicitly by any evidence adduced by Supersonic. As noted above, the record contains no proof that Sony controlled the resale prices of Sonam, or exercised dominion and control over its subsidiary. Absent such evidence, there was nothing for the District Court to consider. *See Reins Distributors, Inc. v. Admiral Corp., supra*, at 585–86.

The orders appealed from are affirmed.

---

er. In discussing the rationale for the "control" requirement the court stated:

. . . [A] fundamental aim of the Robinson-Patman Act [is] to protect buyers' competitors from the evil effects of direct or indirect price discrimination. . . . The "customer" or "purchaser" requirement marks one of the outer limits of the seller's responsibility not to discriminate. As long as he exercises control over the terms of a transaction he is held to this duty; otherwise the requirement of the statute could be easily avoided by use of a "dummy" wholesaler. If there is no control the duty naturally ends, for the manufacturer has no power to protect the buyer's competitors.

300 F.2d at 109–110 (citations and footnotes omitted).

18. *See, e. g., Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323 (9th Cir. 1980), where an indirect purchaser sued ten paper manufacturers which had allegedly conspired to fix prices in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. The Ninth Circuit held that notwithstanding the *Illinois Brick* doctrine, *see* note 16, *supra*, an indirect purchaser, which had purchased from a subsidiary of one of the co-conspirators, did have standing to assert a claim against the manufacturers, and that a conspiring manufacturer would not be permitted to interpose a subsidiary as a shield to antitrust liability.