**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Larry D. BLAVIN, Individually and d/b/a Providence Investment Advisory, Defendant.**

Civ. A. No. 81–74281.

United States District Court, E.D. Michigan, S.D.

March 1, 1983.

Alexia Morrison, David W. Spears, Curt H. Mueller, Washington, D.C., Mark A. Loush, S.E.C., Detroit, Mich., for plaintiffs.

Geoffrey A.D. Smereck, Detroit, Mich., for defendant.

## OPINION

GILMORE, District Judge.

This matter is before the Court upon the Securities and Exchange Commission's (SEC) motion for summary judgment asking the Court to rule that defendant Blavin has violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder; that he has violated §§ 203, 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b–3, 80b–6(1), 80b–6(2), and 80b–6(4), and Rule 206(4)–1 thereunder. Plaintiff also seeks an injunction against Blavin from future violations of these provisions and an order for an accounting and disgorgement of profits Blavin made in connection with his violations of these provisions. For the reasons given hereunder, plaintiff's motion for summary judgment and injunction is granted, as is the motion for an accounting and disgorgement of profits.

The SEC alleges that Blavin, acting as an unregistered investment adviser, engaged

in a fraudulent scheme whereby he purchased large amounts of securities in certain companies, touted the securities in materially false and misleading terms through a newsletter, and then sold the securities at a substantial profit.

This, it is claimed, violated the Securities Exchange Act of 1934 and the Investment Advisers Act of 1940 in two ways. First, by using his newsletter, Blavin engaged in a practice called "scalping," that is, buying stock, touting it in his newsletter, and then selling it for profit. It is claimed here that he did this without fully disclosing to his readers his interest in the stock. Second, in connection with the purchases he made and recommended in his newsletter, he made materially false and misleading statements in order to generate buying interest and cause a price increase.

The motion is brought pursuant to F.R. C.P. 56, which requires the plaintiff to show that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Therefore, the Court must look at the record in this case in the light most favorable to the defendant.

I

Blavin is a pharmacist in Farmington Hills, Michigan, who, in early 1981, began the operation of the Providence Investment Advisory, an investment advisory service which published newsletters recommending the purchase and sale of certain securities. He was the sole proprietor of this business and the sole author of the Providence Newsletter. From at least April through November of 1981, Blavin authored and published six issues of the newsletter discussing and recommending certain stocks. The newsletter was distributed to subscribers in the United States and Canada for a $30 yearly subscription fee.

The May 1981 newsletter was devoted entirely to a discussion of Alanda Energy Corporation, a small Canadian corporation engaged in oil and gas exploration. Just prior to the time the newsletter was issued, Blavin purchased 104,100 shares of the common stock of Alanda. In his newsletter, he recommended the purchase of Alanda stock in glowing terms, referring to it as a "money machine." This newsletter was mailed to approximately 5,500 subscribers and prospective subscribers.

The volume of trading and the price of Alanda stock increased following the dissemination of Blavin's newsletter, and from May 29, 1981 to July 6, 1981, Blavin sold his entire stock of 104,100 shares, reaping a profit of at least $76,000.

The SEC first contacted Blavin in June 1981. At that time, Blavin admitted that he had not registered as an investment adviser, pursuant to the Investment Advisers Act of 1940, and filed an application to register. That application is still pending and has not been acted upon by the Commission. By letter of August 3, 1981, Blavin consented to delay the effective date of his registration pending resolution of an investigation by the SEC as to whether he had violated the Securities Exchange Act and the Investment Advisers Act. Section 203 of the Advisers Act makes it unlawful for a person to function as an investment adviser unless he is already registered under the Act. Thus, the mere fact that Blavin filed an application does not in any way mitigate his liability under the Act.

Despite his agreement to delay the date of his registration pending an SEC investigation, Blavin continued to publish investment newsletters. In October 1981, he published a newsletter recommending the purchase of securities in Velvet Exploration Limited, a Canadian company engaged in oil and gas production, repeating the course of conduct he had employed with Alanda.

Prior to September 1981, he purchased 236,000 shares of Velvet stock. He recommended its purchase in the October 1981 newsletter, again failing to disclose his ownership of the stock, and making false and misleading statements regarding the stock. After the distribution of the newsletter, Blavin sold his shares of Velvet stock in October and November of 1981, profiting at least $268,000.

Again in November 1981, Blavin distributed a newsletter recommending the purchase of stock in I.R.E. Financial Corporation, of which he had purchased at least 141,000 shares between June and November, 1981.

In November 1981, the SEC filed the instant complaint, along with motions for a temporary restraining order and a preliminary injunction. On November 18, 1981, by stipulation of both parties, this court entered an order enjoining Blavin from issuing any further newsletters advising the purchase or sale of any security, or trading in any security which he had mentioned in any of his previous newsletters. In December 1981 the SEC learned that Blavin had sold approximately 47,000 shares of I.R.E. stock after he had published his November newsletter, and in January 1982 this Court entered a preliminary injunction and ordered a temporary disgorgement of $179,-000, the proceeds of his sale of I.R.E.

Blavin continued to violate this court's orders by issuing a newsletter under the name of Target Investment Advisory, recommending the purchase of stock in a company called Himac Resources Limited and by issuing an advisory newsletter in July 1982 called Spectrum 4 Investor Communications, Inc. A criminal contempt action was instituted against Blavin, and in September 1982 this court found Blavin guilty of criminal contempt for repeated and willful violations of the November 18, 1981 order and the preliminary injunction of January 1982, and sentenced him to 30 days in jail and a $1,000 fine. The imposition of sentence was stayed pending appeal.

## II

Section 202(a)(11) of the Investment Advisers Act of 1940, *supra,* defines an investment adviser as:

> [A]ny person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities.

15 U.S.C. § 80b-2(a)(11).

Section 203 of the same Act states that it is unlawful for any investment adviser, unless registered under this Section, to make use of mails or interstate commerce in connection with his or its business as an investment adviser. 15 U.S.C. 80b-3(a).

■ To protect investors, the registration and disclosure provisions of the Act require any person wishing to sell investment advice to apply to the SEC for registration and to provide detailed information about his qualifications. This provision has been called the "core of the Act." *SEC v. Wall Street Transcript Corp.,* 422 F.2d 1371, 1376, (2d Cir.1970) *cert. denied,* 398 U.S. 958, 90 S.Ct. 2170, 26 L.Ed.2d 542 (1970).

■ Blavin, in his affidavits in opposition to the SEC's motion for summary judgment, does not contest the fact that his activities fall within those prohibited by the Act. It is therefore clear that Blavin was an investment adviser within the meaning of the statute, that he failed to register, and that he made use of interstate commerce in connection with his business as an investment adviser. He clearly has violated the statute. Section 203 is a strict liability provision. *SEC v. Myers,* 285 F.Supp. 743 (D.Md.1968).

Although the defendant has not raised the issue, this Court must consider potential First Amendment issues with reference to the publication of the investment advisory letter. Section 202(a)(11) of the Act contains an exception for the publisher of any bona fide newspaper, news magazine, or business or financial publication of general and regular circulation. The Court is convinced, however, that Blavin does not fall within this exception. His "scalping" activity is the very type of activity Congress sought to address when it enacted the Investment Advisers Act. *See SEC v. Capital Gains,* 375 U.S. 180, 191–92, 84 S.Ct. 275, 282–83, 11 L.Ed.2d 237 (1963).

Blavin's situation is very different from that of the defendant in *SEC v. Lowe,* 556

F.Supp. 1359 (E.D.N.Y.1983) where Judge Weinstein found that the First Amendment prohibited the SEC from enjoining an "impersonal" investment adviser from violating the Investment Advisers Act by continuing to publish a market newsletter. Judge Weinstein distinguished the newsletter publisher, whose only advisory activity was the publication of impersonal investment suggestions, reports and analyses, whose activities fall under the protection of the First Amendment, from the investment adviser who has rendered personal investment advice. Blavin was hardly an "impersonal" investment adviser. He had a substantial personal interest in the stock he was touting.

■ Here, in contrast to the situation in *Lowe,* the SEC is seeking to force Blavin to comply with the registration and disclosure provisions of the Act, and to prevent him from recommending stock in which he has a conflict of interest without disclosing that conflict. It is true that the SEC has no authority to review, censor, or in any way restrain investment advisory material prior to publication. If Blavin fully complies with the recording, reporting, and disclosure requirements of the Act, he must be allowed to register for the purpose of publishing and be allowed to publish. The First Amendment protects this right. He cannot be cited or enjoined from a violation of the registration provisions of the Advisers Act insofar as his activities are limited to publishing.

However, Blavin has failed to comply with the Act and has not merely limited his activities to publishing. The only defense he appears to raise to his liability under the registration provision of § 203 is an estoppel theory against SEC. He states in an affidavit that attorneys for the SEC told him that he could continue to publish his newsletter while awaiting registration or, alternatively, that he thought that he was registered as an investment advisor.

■ The Court finds no issue of material fact to defeat summary judgment. Blavin's affidavit statements are totally inconsistent with his depositions on the matter, and, even if they were to be believed, they are insufficient to defeat summary judgment as a matter of law. There is no estoppel against the SEC in enforcement actions. *SEC v. Liberty Petroleum Corporation,* 1971–72 Fed.Sec.L.Rep., (CCH) No. 93–209 (N.D.Ohio 1971). The Government cannot be estopped from bringing an action in the public interest simply because of alleged misconduct by one or more of its agents. And even if Blavin's last-minute statement, never previously raised in these proceedings, that he believed he was registered, were true, § 203 is a strict liability section, and Blavin is still liable.

Thus, summary judgment of liability under § 203 will be ordered for plaintiff.

### III

■ The Court will also grant summary judgment on the issue of Blavin's liability under § 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934, *supra.* Section 10(b) is a basic antifraud provision of the Securities Exchange Act and proscribes the use of any scheme to defraud in connection with the purchase or sale of a security. To be granted summary judgment, the SEC must show that there are no issues of material fact in dispute in connection with its allegations that Blavin (1) used the mails in connection with a fraud; (2) made misstatements or omissions in connection with the purchase or sale of securities; (3) that the misstatements or omissions were material; and (4) that the misstatements were made with scienter. Mere negligence will not suffice to establish liability under § 10(b). *Ernst and Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Scienter is also required before the court can grant injunctive relief. *Aaron v. SEC,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980).

■ Here, there is no dispute that the mails were used. Blavin sent his newsletters to 40 states and Canada, and they were mailed to 5,500 subscribers or potential subscribers. Nor can there be any dispute that the statements were made in connection

with the purchase and sales of securities. The sole purpose of the newsletters was to recommend the purchase of certain stock, which was exactly the same stock that Blavin was contemporaneously buying and selling. These activities fall well within the "fraudulent scheme, the accomplishment of which is directly related to the trading process" definition for the "in connection with" requirement established in *U.S. v. Newman,* 664 F.2d 12, 18 (2d Cir.1981), and is also directly analogous to *Zweig v. Hearst Corp.,* 594 F.2d 1261 (9th Cir.1979), where the "in connection with" requirement was found satisfied where a newspaper financial columnist purchased stock, published a column touting the stock, and then sold the stock for a large profit. Blavin has produced nothing, factual or legal, to counter these allegations.

SEC has offered two theories by which Blavin is alleged to have made material misstatements or omissions with the requisite scienter. First, it points to Blavin's failure to disclose to his readers his substantial ownership interest of stock he was touting and his intent to sell the stock in the near future. SEC claims that this was a material omission that violated § 10(b).

Secondly, the SEC says that the information itself in the newsletters contained material misstatements and omissions. The Court finds that the SEC is correct on both of these issues, and summary judgment must be granted under both theories.

■ A misstatement or omission is material "if there is a substantial likelihood that a reasonable shareholder would consider it important" in deciding whether or not to buy or sell a security. *TSC Industries v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757, 766 (1976). Although *Northway* dealt with proxy laws, the same standard is applied to 10(b) cases. *See Santa Fe Industries v. Green,* 430 U.S. 462, 474 n. 14, 97 S.Ct. 1292, 1301, 51 L.Ed.2d 480, 492 (1977). Blavin did not reveal his scalping scheme, and it is clear to the court that it was a scheme that should have been disclosed to those to whom he sent his investment newsletter. It is obvious, of course, that, if he revealed his scalping scheme to those receiving the newsletter, those parties would not have bought the stock.

■ It is undisputed that Blavin purchased large amounts of securities in companies and then touted those companies in glowing terms to other prospective investors. It is undisputed that Blavin had significant investments in these securities contemporaneously with or immediately after the publication of his newsletters. He did not deal in small amounts. There were 104,100 shares of Alanda, 236,000 shares of Velvet, and 141,528 shares of I.R.E. According to Blavin's own information at the time he recommended these securities, he owned 10 percent of the "float" [1] of Alanda and I.R.E., and 25 percent of the "float" of Velvet.

There can be no doubt that this conflict of interest was material to the readers of Blavin's newsletters and that the defendant failed to inform his readers of the conflict. The protection of the securities laws would be shallow indeed if such "scalping" schemes were permitted. Courts have uniformly held that such schemes violate the securities Law and that a failure to disclose such a "scalping" scheme is a material omission prohibited by § 10(b). The 5,000 shares involved in *Zweig v. Hearst, supra,* pales beside the almost 500,000 shares involved in Blavin's scheme. This Court's position is supported directly by *SEC v. Capital Gains, supra,* where the Supreme Court held that ownership of stock by a *registered* investment adviser was a material fact which should have been disclosed. The Supreme Court concluded that the Investment Advisers Act "require[s] an adviser to make full and frank disclosure of his practice of trading on the effect of his recommendation." 375 U.S. at 197, 84 S.Ct. at 285. It is obvious that a rule of law applicable to a registered investment adviser is even more applicable to Blavin who was not registered and who was thus con-

---

1. "Float" refers to the number of shares freely available in the marketplace, not closely held.

ducting his activities outside of any form of public control.

Blavin's failure to disclose his substantial ownership of stock in the companies he was touting, and his intent to sell them soon after recommending that they be bought, was a material omission in violation of § 10(b). *See Capital Gains, supra,* and *Zweig, supra.*

The final question is whether Blavin acted with scienter in failing to make this disclosure. The SEC must show here that Blavin acted "knowing[ly] and intentionally" in failing to disclose his ownership and intent to sell. *Aaron, supra,* 446 U.S. at 690, 100 S.Ct. at 1952, 64 L.Ed.2d at 622, citing *Ernst & Ernst, supra,* 425 U.S. at 197–99, 96 S.Ct. at 1383–84, 47 L.Ed.2d at 679–80. In *Zweig v. Hearst, supra,* the 9th Circuit presumed an intent to sell by the very fact of the columnist's trading activity, that is, buying the stock, recommending it to readers, and then selling it immediately thereafter. 594 F.2d at 1266. There is no question but that the pattern of Blavin's activity creates an overwhelming presumption that this activity was intentional.

In addition, in his deposition testimony, Blavin admitted that he previously concealed from the SEC the large quantity of Alanda stock he purchased because he knew it would look wrong in view of the fact that he had recommended Alanda. Furthermore, on a form Blavin filed with the SEC in June 1981, he stated that he would not buy or sell a security recommended in his newsletter for 60 days before or after making such a recommendation. This is clear evidence Blavin knew that his scalping activities were wrong. He simply was not telling the truth to his purchasers in his newsletters when he said he would not buy or sell a security for 60 days before or after making the recommendation. He also admitted in his deposition that it would be better if he owned securities other than those recommended in his newsletter "because it would never throw a light on anything that doesn't look like it should."

Presumably, Blavin offers as a material issue of fact the so-called "disclaimer" in miniscule type, written at the bottom of his newsletters. This disclaimer is set forth in the margin.[2] The disclaimer is wholly insufficient to create any material issue of fact as to Blavin's scienter. Rather than help Blavin, the disclaimer harms him. First of all, "Providence Investment Advisory" is a sole proprietorship and not a chartered and registered service as stated in the disclaimer. There is a big difference between a disclaimer which states that perhaps some employees of an investment company may purchase stock and the situation here where Blavin was the sole purchaser and sole individual recommending the stock. There were no employees, officers, or affiliated companies connected with him.

The disclaimer stating that the investment company may have a long or short position in the stock is misleading and also indicative of intent to defraud in the context in the *instant* case. Indeed, Blavin did have a long or short position in the stock he was recommending—of a massive scale—10 percent of the float of the stock in two cases and 25 percent of the float in one case. This false and misleading disclaimer further inculpates Blavin on the issue of scienter under § 10(b) as far as scalping is concerned.

**2.** "Providence Investment Advisory Service may trade for its own account. It may have either a long or short position in these securities. The information set forth herein was obtained from sources which we believe reliable, but we do not guarantee its accuracy. Pursuant to the provisions of Rule 206(4) of the Investment Advisers Act of 1940, we advise all readers to recognize that they should not assume that all recommendations made in the future will be profitable or will equal the performance of any recommendation referred to in this issue. The information presented in this issue has been obtained from sources we believe to be reliable, but its accuracy is not guaranteed. The security portfolio of our employees, officers, or affiliated companies may, in some instances, include securities in this issue."

An additional misstatement is that that the letter says that the Providence Investment Advisory is "a chartered and registered service," which it was not.

Moreover, the Court cannot overlook the fact that the disclaimer is printed in such small type that it is almost illegible and impossible to read.

It is also clear that Blavin made material misstatements and omissions in his newsletters with the requisite intent to defraud. Aside from some glaring misstatements describing Alanda as a "money machine" and its interest in some oil wells as "whopping" and describing Providence Advisory as a "chartered and registered service," defendant made many other material misstatements and omissions:

1. *Alanda:* Blavin stated that its cash flow was in excess of three and a half million dollars; in fact, its cash flow was minimal. He stated that its projected cash flow for 1982 was seven and a half million dollars, when in fact it was one and a half million dollars. He stated that its current assets were three and a half million dollars when in fact its assets were $253,000 (Canadian). He also stated that it had drilled 63 wells in one Oklahoma program, when in fact it had not drilled one well. Furthermore, he stated that by February 1982 Alanda would have 90 wells producing 25,000 barrels daily, when in fact Alanda had no idea what its production would be in February 1982.

2. *Velvet:* Blavin stated that it owned 200 acres of land in Mexico, when in fact it only owned 22 acres. He stated that a partner in one of its mines was the Mexican government, when it was not. He stated that its oil income was $384,000, and knowingly included non-oil income in this figure.

3. *I.R.E.:* Blavin stated that it had over $1,600,000 cash on hand, when in reality it only had $400,000 to $500,000 cash on hand. He stated that a 168 unit condominium was "sold out" with a profit of $12,000 per unit, when in fact it was not sold out and the company did not know what profits it would earn. He stated that expected earnings per share in 1982 were $1.00, when in fact the expected earnings were 40 to 55 cents per share.

There is no doubt that these misstatements were material and within the *Northway, supra,* definition. Furthermore, information concerning the financial condition of a company is presumptively material. *SEC v. Murphy,* 626 F.2d 633, 653 (9th Cir.1980). Blavin offers nothing to rebut these facts.

It is also clear that Blavin made these material misstatements with scienter and that his conduct was knowing or intentional. The Sixth Circuit has held that reckless conduct is "knowing" conduct that satisfies the scienter requirement. *Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017 (6th Cir.1979):

We hold that recklessness is a sufficiently culpable state of mind for liability under § 10(b) and Rule 10b–5.

The overwhelming majority of courts to address this question . . . have concluded that recklessness satisfies the § 10(b)/Rule 10b–5 scienter requirement. . . .

. . . At common law, recklessness satisfied the scienter requirement for fraud . . . drawing upon the analogy between the § 10(b)/Rule 10b–5 claim and common law fraud, it is appropriate to hold that recklessness constitutes sufficient scienter for both.

Cases abound which hold that the § 10(b)/Rule 10b–5 claim for relief is to be liberally construed in order to effectuate the policies underlying the federal securities laws . . . Requiring a plaintiff to show that the defendant acted with actual subjective intent to defraud could impose a great burden upon recovery, greatly limiting the § 10(b)/Rule 10b–5 claim.

*Id.* at 1023–25, footnotes and citations omitted.

Further, the court defined recklessness as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Id.* at 1025, *citing Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977).

There is no doubt that, at the very least, Blavin's conduct was reckless. Blavin has submitted affidavits which, if taken as true, would indicate that he received all of the information contained in the alleged misstatements from financial reports or the oral statements of the officers of the companies he touted. This, however, does not create a material issue of fact as to Blavin's recklessness.

■ Taking his affidavits as true, he acted recklessly by simply taking material from a financial report and reprinting it. Blavin purported to be an investment adviser, and, as such, had a duty to his clients and readers to undertake some reasonable investigation of the figures he was printing before he printed them. Certainly, a reader of an investment newsletter has the right to expect the investment adviser to do more than merely reprint (and in this case totally out of context and selectively) glowing financial news gleaned from financial reports or conversations with companies or officers.

■ Furthermore, Blavin's disclaimer that the information came "from sources we believe to be reliable" is totally misleading and reckless in the context of a situation where the purported investment adviser had made no investigation at all as to the reliability of the information. An investment adviser cannot recklessly state facts about which he is ignorant, but must analyze sales literature and other materials and not blindly accept recommendations made therein. *Hanly v. SEC,* 415 F.2d 589, 596 (2d Cir.1969).

■ It is clear that at the very least Blavin acted recklessly within the scienter requirements of § 10(b). This is true even if everything in Blavin's affidavits is accepted as true, but it should be noted that there is a great deal of evidence to discount the affidavits, which are blatantly inconsistent with deposition testimony of Blavin and others. The depositions show that, not only did Blavin act recklessly, he acted with a specific intent to deceive. Blavin himself admitted on deposition that he made up many of the figures on his own and that he

did not correct inaccuracies when told to do so by company officials. Company officials deny telling Blavin the information he claims they told him.

There is ample authority that summary judgment cannot be avoided, and issues of fact created, by submitting affidavit testimony that directly contradicts deposition testimony where no new evidence is contained in the affidavits that could not have been raised in the deposition, either on direct testimony or under cross-examination.

*Moore,* discussing the matter, states:

> The deposition of a witness will usually be more reliable than his affidavit, since the deponent was either cross-examined by opposing counsel, or at least available to opposing counsel for cross examination. Nevertheless if the witness has made an affidavit and his deposition has also been taken or he has made two affidavits, and the two in some way conflict, the court may not exclude the affidavit from consideration in the determination of the question whether there is any genuine issue as to any material fact.

6 *Moore's Federal Practice* ¶ 56.22[1] at 56-1325-26 (2d ed. 1982).

This statement impliedly authorizes courts to consider the conflicts between the deposition and affidavits on motions for summary judgment, and make a determination as to which to believe. In *Schwimmer v. Sony Corporation of America,* 637 F.2d 41 (2d Cir.1980), the court said:

> Since the District Court could properly rely upon Schwimmer's earlier deposition testimony, as opposed to his later conflicting hearsay affidavit, ... it correctly concluded that there was no genuine issue of fact barring Sonam from recovering the $54,133.50 credited to Supersonic on the basis of fraudulent submissions.

*Id.* at 45 (citation omitted).

This Court also noted, in footnote 9, that a hearsay affidavit is a nullity on a motion for summary judgment. *Id.* at 45 n. 9 (citation omitted).

A leading case on the subject is *Perma Research & Development Co. v. Singer Co.,*

410 F.2d 572 (2d Cir.1969). There the court held, on a motion for summary judgment, that the trial judge could properly conclude that a statement made in an affidavit was less reliable than the contradictory statements in a deposition and that the statement in the affidavit did not raise a triable issue of fact. *Accord Reisner v. General Motors Corp.,* 671 F.2d 91 (2d Cir.1982) *cert. denied,* —— U.S. ——, 103 S.Ct. 130, 74 L.Ed.2d 112; *Radobenko v. Automated Equipment Corp.,* 520 F.2d 540 (9th Cir. 1975).

Either using a standard of recklessness or actual intent, Blavin's affidavits create no issues of material fact. Most of the cases cited in his post hearing memorandum of law are not relevant to the instant case, and Blavin's newsletters are a far cry from a "reasoned and justified statement of opinion, one with a sound factual or historical basis" found not to be actionable in *Connellan v. Himelhoch,* 506 F.Supp. 1290, 1298 (E.D.Mich.1981), *quoting G & M, Inc. v. Newbern,* 488 F.2d 742 (9th Cir.1973).

## IV

■ The Court also finds that Blavin has violated Sections 206(1), 206(2), 206(4), and Rule 206(4)–1 of the Investment Advisers Act. Section 206.(1) has provisions analogous to § 10(b) specifically proscribing fraudulent practices by investment advisers and requiring scienter. *Steadman v. SEC,* 603 F.2d 1126 (5th Cir.1979) *aff'd,* 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981). Once it is found that Blavin is an investment adviser, which he was under the Act, all of the previous analysis establishing liability under 10(b) applies here. With reference to § 206(2) of the Investment Advisers Act, Blavin is also in violation because he engaged in conduct which operated as a fraud on his clients or prospective clients. Failure to disclose a scalping scheme as a fraud or deceit violates § 206(2), and scienter is not required. *SEC v. Capital Gains, supra.*

■ Section 206(4) makes it unlawful for an investment adviser to engage in any act which is fraudulent, deceptive or manipulative. This is a looser standard than that of 206(1), which requires a *scheme* to defraud, and, therefore, liability under 206(1) would also create liability under 206(4).

Finally, Rule 206(4)–1(a)(5) further forbids the distribution of any advertisement which contains any untrue statement of a material fact or which is "otherwise misleading." Blavin does not contest the allegation that his newsletter is an advertisement within this Rule, and this Rule prohibits statements that are not only materially misleading, which has been discussed earlier, but also statements that fall short of the materiality standard.

## V

It therefore appears clear from all that has been said that the SEC is entitled to a summary judgment on all issues in this case, and the Court will order it.

■ There remain the questions of a permanent injunction and disgorgement. The SEC is requesting a permanent injunction enjoining Blavin from future violations of the Securities Exchange Act and the Investment Advisers Act. Section 21(d) of the Securities Exchange Act, 15 U.S.C. § 78u(d) and § 209(e) of the Investment Advisers Act, 15 U.S.C. § 80b–9(e). A court is empowered to issue an injunction upon a showing that a defendant is engaged, or is about to engage, in acts or practices constituting a violation of the Exchange Act or the Advisers Act. A "showing" for these purposes requires a finding of the likelihood or propensity to engage in future violations. *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90 (2d Cir.1978).

■ This Court has no problem in finding a likelihood or propensity to engage in future violations on the part of Blavin. His own repeated violation of this Court's orders, for which he was convicted of criminal contempt, is indicative enough of a showing of likelihood. The Court also considers the large scale of Blavin's violations here, his lack of recognition of the wrongfulness of

his conduct, and his repeated violations of the securities laws after he was contacted by the SEC, in making a finding that this is a proper case for a permanent injunction.

It appears clear that a permanent injunction enjoining defendant from future violations of the Exchange Act and the Investment Advisers Act should issue. The plaintiff may present such an injunction.

### VI

Finally, the SEC has asked the Court to order the disgorgement of Blavin's profits wrongfully gained in violation of the securities law.

 It is well established that the securities laws confer general equitable powers upon district courts. *SEC v. Commonwealth Chemical Securities, supra; SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1307 (2d Cir.1971) *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558. Once the equity jurisdiction of the district court has been properly invoked by a showing of securities laws violations, the court possesses the necessary power to fashion an appropriate remedy, and while the securities laws do not specifically authorize the ancillary relief of disgorgement, "[i]t is for the federal courts to adjust their remedies so as to grant the necessary relief where federally secured rights are invaded." *J.I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423, 428 (1964). *See SEC v. R.J. Allen & Associates, Inc.,* 386 F.Supp. 866, 881 (S.D.Fla.1974).

 Disgorgement is closely linked to the traditional equitable remedy of restitution. A historical equitable remedy was the grant of restitution "by which defendant is made to disgorge ill-gotten gains or to restore the status quo, or to accomplish both objectives." *See, 5 Moore's Federal Practice,* ¶ 38.24[2], at 38–195 (2d ed.1981). Effective enforcement of the securities laws requires that the SEC be able to make violations unprofitable. The deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not to disgorge illegal profits.

*SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1104 (2d Cir.1972). Because of its importance as a deterrent, disgorgement is a frequent remedy of securities laws violations. *See SEC v. Washington County Utility District,* 676 F.2d 218, 227 (6th Cir. 1982), where the court stated that upon remand if the district court should find further violations of securities laws, it would be justified in holding an evidentiary hearing to determine what additional amounts, if any, should be disgorged.

 The Court concludes that it should order disgorgement of illegal profits received in this case. In so doing, the Court is especially aware of the deterrent value here. Blavin's repeated violations of this Court's orders convinces the Court that only the drastic remedy of disgorgement will deter Blavin from future violations and deter other possible wrongdoers. In making this assessment, the Court is fully aware that disgorgement is remedial, not punitive. *SEC v. Blatt,* 583 F.2d 1325, 1335 (5th Cir. 1978). The Court's power to order disgorgement extends only to the amount, with interest, by which Blavin profited from his wrongdoing. Recognizing that restitution can only cover the profits Blavin actually gained from his wrongdoing, plus interest, the Court directs the SEC to prepare a plan for disgorgement, and will hold an appropriate hearing to determine the amount of money to be disgorged. In addition, the SEC shall prepare a plan for the disposition of funds ordered disgorged. This plan should provide, wherever possible, for restitution of these funds to persons who lost money at Blavin's hands.

A judgment embodying the findings of this opinion may be presented. A plan for disgorgement should be presented to this Court within 30 days of this opinion. At that time, the Court will set a date for a hearing on the disgorgement.